[This opinion has been published in *Ohio Official Reports* at 86 Ohio St.3d 329.]

THE STATE OF OHIO, APPELLEE, *v.* FEARS, APPELLANT.

[Cite as *State v. Fears*, 1999-Ohio-111.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 98-19—Submitted March 9, 1999—Decided September 8, 1999.)

APPEAL from the Court of Common Pleas of Hamilton County, No. B9702360.

———————————

{¶ 1} During the early morning hours of March 30, 1997, Antwuan Gilliam was shot to death in a high-crime area in Cincinnati known as "Over-the-Rhine."

{¶ 2} The afternoon prior to the shooting, defendant-appellant Angelo Fears warned his friend, Darius Harris, to stay off the streets that night after 11:00 p.m. because he and James Grant were planning to rob people. At around 1:00 a.m., Gilliam was on the street outside his apartment talking to his girlfriend, Keyona Haynes. Gilliam's friend, Steven Franklin, approached him and asked where Derrick Frazier was because he wanted to purchase two ounces of crack cocaine. Although Gilliam also dealt drugs, Frazier had recently purchased over twenty-eight ounces of crack cocaine worth $21,000. Gilliam went into an alley and yelled to Frazier, who was inside his girlfriend's nearby apartment, to come outside.

{¶ 3} Frazier came outside and then took Franklin to another apartment, where he kept the crack cocaine while staying with his friend, Lakesha Bryant. Bryant opened the door, let the men in, and went back to bed. Her young child was asleep in another bedroom. Frazier retrieved two ounces of crack cocaine from the safe, and put the drugs on the kitchen table. In the meantime, James Grant and appellant pulled up in a van and were seen talking to Gilliam outside the apartment building. Gilliam knocked on the door when Frazier and Franklin were discussing the price of the drug transaction. Frazier let Gilliam in, but as Gilliam was closing the door, James Grant stepped inside the apartment. At first, Grant asked to buy a

small amount of crack cocaine, but then pulled out a gun and aimed it at Franklin, who was holding $2,000 in his hands, and told him to "lay it down." At this point, appellant entered the apartment with a gun in his hand. Franklin dropped the money and James told appellant to pick it up. Appellant took the money as well as Franklin's bracelets and rings.

{¶ 4} Franklin and Gilliam dropped to the floor. According to Franklin, Grant then told appellant, who by that time was armed with a gun in each hand, to "shoot one of them niggas." Appellant pointed the gun at Gilliam, but Grant said, "no, shoot him" referring to one of the other men. Appellant said, "No, I'm going to shoot him [Gilliam]." Appellant pointed his gun at Gilliam's buttocks and said "I should shoot you right here in your bootie." Gilliam pleaded with him not to kill him, but appellant told Gilliam, "I don't give a fuck about killing you." Appellant then fired a single shot into Gilliam's left temple, killing him.

{¶ 5} In the meantime, Grant had gone into a back bedroom. When he returned, he shoved his gun in Frazier's face, asked where the rest of the drugs were, and said, "Nigger, I should kill you." Grant forced Frazier at gunpoint to the back bedroom. Frazier opened the safe and Grant took the bulk of the remaining crack cocaine. While Grant and Frazier were in the back, Franklin escaped by jumping out a window to the alley below. Both Grant and appellant then fled the apartment. Gilliam's girlfriend saw appellant running from the apartment building and saw appellant and Grant drive off in a van.

{¶ 6} Bryant called 911 at 1:29 a.m. The police arrived at the scene shortly thereafter. The police interviewed witnesses and several people identified appellant in a photo array as the person who fired the gun and fatally shot Gilliam. Gilliam's body was taken to the morgue. The coroner determined that Gilliam's cause of death was a gunshot wound to the head, with perforation of the skull and brain.

{¶ 7} Grant was arrested around 9:00 a.m. the day of the shooting. In the process of arresting Grant, police learned that the gun used to kill Gilliam had been

2

given to a Solomon Grant. The police retrieved the gun, and ballistic tests revealed that the projectile found in Gilliam's body was fired from that gun.

{¶ 8} On April 13, 1997, police arrested appellant after receiving a tip from Crime Stoppers as to appellant's whereabouts. Appellant was charged in a twelve-count indictment with four counts of aggravated murder, one count of aggravated burglary, three counts of aggravated robbery, and four counts of kidnapping. The aggravated murder counts charged that appellant was the principal offender and that he murdered Antwuan Gilliam with prior calculation and design. Gun specifications were attached to all charges.

{¶ 9} Appellant was found guilty in a jury trial as charged, and the case proceeded to the penalty phase. Appellant presented testimony from several family members who detailed his abusive and neglected upbringing. A psychologist also testified that appellant has a low I.Q. of between seventy-five and eighty, is alcohol-dependent, and suffers from a personality disorder. The jury recommended that appellant be sentenced to death. The trial court adopted the jury's recommendation and imposed the death penalty on appellant. The court imposed concurrent ten-year sentences on counts five through twelve of the indictment, consecutive to the death penalty, and additional three-year consecutive sentences on the firearm specifications, which were merged.

{¶ 10} The cause is now before this court upon an appeal as of right.

———————————

*Michael K. Allen*, Hamilton County Prosecuting Attorney, and *Ronald W. Springman*, Assistant Prosecuting Attorney, for appellee.

*H. Fred Hoefle* and *Cathy R. Cook*, for appellant.

———————————

**FRANCIS E. SWEENEY, SR., J.**

{¶ 11} Appellant has raised twenty-eight propositions of law, which we have fully considered. (See Appendix.) Pursuant to *State v. Poindexter* (1988), 36

Ohio St.3d 1, 520 N.E.2d 568, and subsequent cases, we summarily reject without discussion those propositions of law where the error was not properly preserved or where the issues raised have been addressed by this court and rejected. We have also considered the death penalty for appropriateness and proportionality. Upon review, and for the reasons that follow, we uphold appellant's convictions and sentences, including the sentence of death.

I

## PROSECUTORIAL MISCONDUCT

{¶ 12} In his first and twenty-first propositions of law, appellant alleges numerous instances of prosecutorial misconduct, in both the guilt and penalty phases of the trial. The test for prosecutorial misconduct is whether the conduct complained of deprived the defendant of a fair trial. *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 24, 514 N.E.2d 394, 400. For the reasons that follow, although we find no reversible error, we express our deep concern over some of the remarks and misstatements made by the prosecutors involved in this case. While we realize the importance of an attorney's zealously advocating his or her position, we cannot emphasize enough that prosecutors of this state must take their roles as officers of the court seriously. As such, prosecutors must be diligent in their efforts to stay within the boundaries of acceptable argument and must refrain from the desire to make outlandish remarks, misstate evidence, or confuse legal concepts. Nevertheless, because we find that none of the errors complained of rises to the level of plain error, we do not reverse this case based upon prosecutorial misconduct. The alleged errors are discussed as follows.

{¶ 13} In his first proposition of law, appellant contends that one of the prosecutors (Mr. Prem) improperly argued nonstatutory aggravating circumstances, when he stated the following during his closing argument in the penalty phase of the trial:

"I submit to you there is nothing mitigating in the manner in which Angelo

Fears purposely killed Antwuan Gilliam. There's no mitigation in that."

"What kind of terror did he [appellant] put into Derrick Frazier's head? He told us he peed in his pants. How is that for aggravating circumstances?"

"Well, I guess there's some mitigation there because, you know, * * * he left [Lakesha] alone and that four-year-old baby there. He didn't touch that child. There's mitigation for you. There's mitigation for you. The murder. You have to look at the nature and circumstances of the murder."

"[D]oes that abuse [that appellant suffered as a child], is that justification or is that a mitigation factor sufficient to outweigh the brutal death of Antwuan Gilliam[?]"

{¶ 14} Except for the comment regarding Derrick Frazier, defense counsel did not object to the other remarks. Therefore, those comments that were not objected to are analyzed under the plain error rule, since "[a] claim of error in a criminal case can not be predicated upon the improper remarks of counsel during his argument at trial, which were not objected to, unless such remarks serve to deny the defendant a fair trial." *State v. Wade* (1978), 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus.

{¶ 15} In *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 662 N.E.2d 311, at paragraph two of the syllabus, we held that "[i]t is improper for prosecutors in the penalty phase of a capital trial to make any comment before a jury that the nature and circumstances of the offense are 'aggravating circumstances.' " The "aggravating circumstances" are limited to those factors set forth in R.C. 2929.04(A)(1) through (8) that are specified in the indictment and proved beyond a reasonable doubt. *Id.* at 351, 662 N.E.2d at 318.

{¶ 16} It is clear that the prosecutor in this case erred in referring to the terror appellant inflicted on Derrick Frazier as an "aggravating circumstance." As we have previously stated, it is improper for a prosecutor to "suggest that * * * the suffering and mental anguish the victims endured was an aggravating

circumstance." *State v. Combs* (1991), 62 Ohio St.3d 278, 283, 581 N.E.2d 1071, 1077. The prosecutor also erred by telling the jury that it should weigh appellant's childhood abuse against the nature and circumstances of the offense. The nature and circumstances of the offense can be weighed only against the proven aggravating circumstances. In addition, with that comment, the prosecutor implied that mitigation must outweigh aggravation. Nevertheless, although these comments were improper, we do not find that they rise to the level of plain error.

{¶ 17} Appellant also states that the prosecutor improperly told the jury in opening argument to consider the nature and circumstances of the offense itself and to weigh these against the aggravating circumstances. We find no error in this comment.

{¶ 18} Appellant further contends that both prosecutors erred by commenting on his lack of remorse. First, Prosecutor Prem argued that "the doctor [Dr. Smalldon] said he [appellant] doesn't care. He is callous. He doesn't have any remorse. He doesn't regret the consequences of what he does." Then, Prosecutor Russell stated: "He shot them with no remorse. He shot them in front of two other people and he pistol whipped Derrick Frazier." While it is impermissible to turn the nonexistence of a mitigating factor, such as remorse, into an aggravating circumstance (*State v. Tyler* [1990], 50 Ohio St.3d 24, 41, 553 N.E.2d 576, 596), a prosecutor is entitled to rebut the evidence of remorse presented by the defendant, *State v. Awkal* (1996), 76 Ohio St.3d 324, 336, 667 N.E.2d 960, 971. As we stated in *State v. McGuire* (1997), 80 Ohio St.3d 390, 395, 686 N.E.2d 1112, 1117, *State v. Tyler* "does not hold that the state cannot comment on the lack of remorse whenever the defendant denies guilt. Rather, it holds that the state cannot refute potential mitigating factors that the defense has not first placed in issue." Since appellant expressed remorse in his unsworn statement, the prosecutors did not err in making these comments.

{¶ 19} Another comment alleged to be improper is the prosecutor's

6

reference to Dr. Smalldon as defense counsel's "mouth piece." This comment insinuates that defense counsel has paid the expert simply to have him parrot their opinions. It is obviously intended to denigrate defense counsel. However, the trial court sustained an objection to this remark and instructed the jury to disregard it. The jury is presumed to have followed the court's instructions. *State v. Raglin* (1998), 83 Ohio St.3d 253, 264, 699 N.E.2d 482, 492. Appellant further argues that it was improper for the prosecutor to state in closing argument that the defense expert was being paid with taxpayer money. Again, although it may be proper to discuss an expert's fee to show bias or pecuniary interest, this comment injects an impermissible reference to taxpayer's contributions, by which the prosecutor obviously hoped to gain an unfair advantage. However, even though improper, these remarks do not rise to the level of prejudice found in *State v. Keenan* (1993), 66 Ohio St.3d 402, 406, 613 N.E.2d 203, 207.

{¶ 20} Appellant alleges that the prosecutors erred in asking his mother impermissible questions regarding a criminal charge against her and a competency examination connected to that charge. Even though appellant's mother had not yet been sentenced, the prosecutor was entitled to impeach her with her guilty plea to burglary. *State v. Cash* (1988), 40 Ohio St.3d 116, 532 N.E.2d 111, syllabus. Furthermore, defense counsel did not object to the questions regarding her conviction or her competency, so the claims are waived.

{¶ 21} Appellant also says that the prosecutors erred in asking mitigation witnesses questions as to whether they believed that appellant knew right from wrong. This door had already been opened by the defense in its questioning of these witnesses. Therefore, appellant cannot claim error. In a similar vein, appellant objects to the line of questioning regarding whether he belonged to a gang and regarding an assault he had been involved in. Since appellant's brother had already testified that appellant had never been the type of person who would hurt anyone, this line of questioning was not error. Moreover, appellant's sister denied

any gang membership and his brother denied appellant's involvement in the assault. Appellant cannot claim prejudice by these remarks.

{¶ 22} Several misconduct allegations stem from a dispute at trial over whether the prosecutors were entitled to see Smalldon's interview notes. The trial court ruled that the state could not receive these notes. Nevertheless, the prosecutor made several comments about these notes in the presence of the jury. The prosecutor asked Smalldon, over objection, whether he provided these notes to the state. The prosecutor also alluded in cross-examination to Smalldon's failure to write a report. The court sustained several defense objections. Finally, in closing argument, the prosecutor argued to the jury that Smalldon's bias was shown by his refusal to give information to the state. Prosecutor Russell stated: "He [Smalldon] was reluctant to give up what was in his file. He was reluctant to tell us what the defendant had told him. He was unwilling to give us his notes and unwilling to write a report." Defense counsel objected, and the judge sustained the objection as to the notes and instructed the jury to disregard the comment. Since the trial court had initially overruled the state's request for Smalldon's notes, the prosecutor should not have made these comments, which cast an improper light on Smalldon and accused him of wrongdoing and withholding of pertinent information. However, even in combination with the above errors, we do not believe that appellant was denied a fair trial by any of these remarks.

{¶ 23} In appellant's twenty-first proposition of law, he alleges the following instances of prosecutorial misconduct during the guilt phase. First, appellant claims that it was improper for the prosecutor, during voir dire and in closing argument, to discuss possible defenses that were not argued by defense counsel. In particular, appellant points to the questioning in voir dire by Prosecutor Russell, where she began to tell the venireman what she expected would be "one of the major issues." Before she said what the issue was, a defense objection was sustained. The prosecutor rephrased the question and discussed the concept of a

purposeful versus accidental killing. Appellant contends that by discussing these concepts, the prosecutor implied that appellant would argue that he accidentally shot the victim. Since the trial court sustained defense counsel's objection and the prosecutor never completed her thought as to what one of the main issues was, we do not believe that appellant was prejudiced by these remarks.

{¶ 24} Appellant also argues that Prosecutor Prem made an improper remark during voir dire and led the venire to presume that appellant had the intent to commit the crimes when he told prospective jurors that appellant and James Grant "were going to rob people. If they had to kill somebody, they were going to do it." Although the trial court sustained defense counsel's objection, appellant argues that a curative instruction should have been given. However, the record does not reflect a request for such an instruction. Again, this remark does not amount to prejudicial error.

{¶ 25} Appellant contends that the following remarks made by the prosecution in voir dire and in closing argument of the guilt phase regarding the intent of appellant were also improper. First, Prosecutor Prem asked a venireman whether it was possible to determine someone's intent "without having them help us figure that out?" Then, during closing argument, Prosecutor Russell said:

"He [defendant] brings a loaded semi-automatic weapon into a home-invasion robbery. You can infer that as purpose. Listen to what 'purpose' is. It's a conduct, manner the weapon was used. He is bringing a loaded semi-automatic. If you only want to scare somebody, why did he have it loaded? Bring it in and pointed it.

"*It's clear he is going to tell you that he never was going to kill him. Gun wasn't loaded.*" (Emphasis added.)

{¶ 26} A defense objection was sustained.

{¶ 27} Turning to the first remark, we note that it is improper for a prosecutor to comment on the defendant's failure to testify. *Griffin v. California*

9

(1965), 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106; *State v. Cooper* (1977), 52 Ohio St.2d 163, 173, 6 O.O.3d 377, 382-383, 370 N.E.2d 725, 732-733; *State v. Webb* (1994), 70 Ohio St.3d 325, 328-329, 638 N.E.2d 1023, 1028-1029. However, to determine whether there is a violation of a defendant's Fifth Amendment rights, we must decide " 'whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.' " (Emphasis deleted.) *Id.* at 328, 638 N.E.2d at 1028, quoting *Knowles v. United States* (C.A.10, 1955), 224 F.2d 168, 170. The comments made by Prosecutor Russell suggest an impermissible reference to appellant's failure to take the witness stand. However, these comments can also be read as a reference to appellant's defense of lack of intent. While we in no way condone the choice of words used, we do not believe that the jury would necessarily take them to be comments on appellant's failure to testify. As to the comment regarding the gun, we find that this was improper, since the defense never contended that the gun was not loaded.

{¶ 28} Although we are greatly disturbed by Prosecutor Russell's and Prem's lack of restraint and their willingness to utter such inflammatory remarks, we cannot say that these comments constitute reversible error. The evidence of guilt in this case is so overwhelming that none of the prosecutors' comments, even if error, amounted to reversible error. Upon review of the entire record, we find that none of the alleged instances of misconduct that occurred affected the fairness of the trial. We overrule appellant's first and twenty-first propositions of law. If this kind of activity continues, it is just a matter of time before it affects the outcome of a trial.

II

TRIAL ISSUES

A

Voir Dire

**{¶ 29}** In proposition of law twenty-four, appellant argues that several prospective jurors were improperly excused for cause due to their opposition to the death penalty. In particular, appellant contends that the challenges for cause should not have been granted, since none of the challenged prospective jurors unequivocally stated that their beliefs would prevent them from recommending the death penalty or that they would be unable to follow the instructions of the court in considering whether to impose the death penalty.

**{¶ 30}** The standard for determining whether a prospective juror should be removed for cause due to his or her views regarding the death penalty is whether those views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (Emphasis deleted.) *Wainwright v. Witt* (1985), 469 U.S. 412, 420, 105 S.Ct. 844, 850, 83 L.Ed.2d 841, 849, quoting *Adams v. Texas* (1980), 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581, 589. See *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus. In reviewing challenges for cause based upon prospective jurors' views on capital punishment, we are mindful that the trial judge's ruling will not be disturbed on appeal unless it constitutes an abuse of discretion. *State v. McNeill* (1998), 83 Ohio St.3d 438, 445, 700 N.E.2d 596, 605.

**{¶ 31}** The record supports the trial court's decision to excuse the prospective jurors for cause based upon their opposition to the death penalty. Contrary to appellant's assertion, several of the prospective jurors unequivocally stated that they could not fairly consider the death penalty. Prospective jurors Hyams, Taylor, Martins, Reilly, and Koch said they could never vote for the death penalty. Reilly, Koch, and Hyams opposed the death penalty even for Hitler. Prospective juror Dusseau was adamant in his opposition, stating that it was against his religion and that it was up to God to take a life. Prospective juror Johnson also said he could not fairly consider the death penalty.

{¶ 32} Prospective juror Gale, who was reluctant to serve due to child-care difficulties, initially felt she could return a death recommendation. However, during a later session, Gale asked to address the court and advised the court unequivocally that she could "never be involved in the decision whether or not someone lives or dies unless it's self-defense." Appellant insinuates that Gale was burdened with finding child-care and that she changed her position on the death penalty in order to be excused from jury duty. However, appellant cannot prove this allegation. The trial court's reason for Gale's removal, that her views on capital punishment would substantially impair the performance of her duties as a juror, is supported by the views Gale expressed. We find no abuse of discretion in the trial court's removal for cause of prospective juror Gales.

{¶ 33} Likewise, although prospective jurors Moore, Wackerly, Johnson, and Landy were not adamant in their blanket opposition to the death penalty, we do not believe that it was an abuse of discretion to exclude these jurors for cause. They either stated that they did not think they could fairly consider the death penalty or that they could not apply that penalty under the facts of this case. The trial judge was in the best position to observe their demeanor and body language and to determine that these prospective jurors could not be impartial and follow the law. See *State v. Williams* (1997), 79 Ohio St.3d 1, 8, 679 N.E.2d 646, 654. We reject this proposition of law.

{¶ 34} In his twenty-fifth proposition of law, appellant contends that he was deprived of an impartial jury because the trial court refused to grant his motion for individual sequestered voir dire. The manner of conducting voir dire is within the sound discretion of the trial court. *State v. Lorraine* (1993), 66 Ohio St.3d 414, 418, 613 N.E.2d 212, 217. There is no requirement that voir dire in a capital case must be conducted in sequestration. *State v. Brooks* (1996), 75 Ohio St.3d 148, 156, 661 N.E.2d 1030, 1038, citing *State v. Brown* (1988), 38 Ohio St.3d 305, 528 N.E.2d 523, paragraph two of the syllabus. The record reveals that there was a full

and comprehensive voir dire and that there was no abuse of discretion in failing to allow sequestered voir dire. Accordingly, we reject appellant's twenty-fifth proposition of law.

B

Admissibility of Evidence

1. Identification of Appellant

{¶ 35} In propositions of law sixteen and seventeen, appellant argues that the trial court erred in allowing Lakesha Bryant to testify regarding the identity of appellant. At trial, Bryant conceded that she remained in her bedroom during the course of the robbery and shooting and neither saw appellant nor recognized his voice. Nevertheless, when asked how she was able to give appellant's name to police, she answered, over objection: "Two guys that were standing outside told me who it was." Bryant gave similar testimony at the hearing on appellant's motion to suppress identification. In addition, Bryant testified at trial that she identified appellant in a photo lineup at police headquarters.

{¶ 36} Appellant contends that this testimony should have been suppressed because it is hearsay and violates Evid.R. 602. The state argues that it was elicited for a nonhearsay purpose, "to explain her subsequent actions of going down to the police station and identifying defendant from a photo line-up rather than to prove the truth of the statement." The state also contends that if this was improper testimony, it would constitute harmless error because it was cumulative to the testimony of two other eyewitnesses who identified appellant as the one who killed Gilliam. We find that this testimony was improper hearsay and served no relevant purpose. Given the fact that Bryant herself admits that she could not possibly place appellant at the crime scene, or implicate him as the person who fired the fatal shot, we find that her reference to what others told her about appellant's presence was hearsay. For this reason, her identification of appellant in a photo lineup should have been suppressed. However, the defense did not dispute that appellant shot

Gilliam and we find that under these facts, Bryant's testimony was cumulative and constitutes harmless error, since the error did not contribute to the verdict. *Chapman v. California* (1967), 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710-711.

2. Admissibility of Tape Recordings and Witness Statements

**{¶ 37}** Appellant also contends in proposition of law twenty-two that under Evid.R. 801(D)(1)(b), the trial court improperly admitted into evidence Bryant's 911 call and statement she made to police as well as Derrick Frazier's taped interview with police.

**{¶ 38}** Evid.R. 801(D)(1)(b) provides that a prior consistent statement is not hearsay if it "is offered to rebut an express or implied charge against [the declarant] of recent fabrication or improper influence or motive." Lakesha Bryant testified on direct examination that she called 911 after the shooting. On cross-examination, Bryant said she did not recall what she told the 911 operator. Defense counsel sought to refresh her memory and to impeach her credibility with questions pertaining to the 911 tape and the statement she made to police. On redirect, over objection, the state introduced the 911 tape and her taped interview with police. This was clearly improper, since on cross-examination no reference to or implication of fabrication or undue influence was made, which is the basis for admitting such statements under Evid.R. 801(D)(1)(b). However, we find that this is harmless error, particularly since Bryant was not a key witness to the murder.

**{¶ 39}** As to Derrick Frazier's taped statement, the state introduced the statement after investigating Officer Feldhaus testified as to some inconsistencies with Frazier's testimony. Although appellant argues inadmissibility under Evid.R. 801(D)(1)(b), the state argues that it invoked Evid.R. 106 to admit the recorded statement. Evid.R. 106 provides: "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which is

otherwise admissible and which ought in fairness to be considered contemporaneously with it."

{¶ 40} At trial, the state said that it intended to play the taped statement because the defense had already introduced part of it to the jury. This is incorrect. The defense did not introduce the statement, but merely referred to a transcript of the interview in cross-examining Feldhaus. Since the defense did not introduce any "writing or recorded statement," the taped interview was not admissible under this rule. However, we find that the admission of this taped statement is harmless. Frazier's statement to Feldhaus did not differ from his trial testimony in any important respect, nor did he contradict anything pertaining to a main issue in the case. Moreover, Officer Feldhaus had already given the jury his account of the interview before the tape was played. We overrule appellant's twenty-second proposition of law.

## C

### Unrecorded Proceedings

{¶ 41} In his fifteenth proposition of law, appellant objects to the fact that the trial judge and attorneys discussed a number of motions off the record without a court reporter present. Although Crim.R. 22 requires that proceedings be recorded in serious offense cases, defense counsel acquiesced to this procedure, and we do not find that the failure to record these discussions rises to plain error. Accordingly, we overrule appellant's fifteenth proposition of law.

III

JURY INSTRUCTIONS

**{¶ 42}** In his twenty-third proposition of law, appellant argues that the trial court erred in instructing the jury, at the state's request and over defense counsel's objection, on the defense of accident. The trial judge instructed the jury as follows: "[A]n accidental result is one that occurs unintentionally and without any design or purpose to bring it about. An accident is a mere physical happening or event out of the usual order of things and not reasonably anticipated or foreseen as a natural or probable result of a lawful action."

**{¶ 43}** Appellant contends that this instruction confused the jury and made it appear that the defense was asserting something more than a lack of purpose. We disagree. The concept of accident is tantamount to a denial that the act was intentional. Throughout the trial, defense counsel challenged the state's evidence of intent. The instruction on accident, in effect, underscores the position taken by defense counsel that appellant did not intentionally cause the death of the victim. The trial court made it clear that "purpose to cause the death" is an essential element of aggravated murder and that the state had to prove all the elements of the offense beyond a reasonable doubt, including that appellant had the specific intent to cause the death of Antwuan Gilliam. It is fundamental that jury instructions must be considered as a whole. See *State v. Price* (1979), 60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772. When the jury instructions in this case are read as a whole, we find no error with this charge. Therefore, we reject appellant's twenty-third proposition of law.

**{¶ 44}** In proposition of law thirteen, appellant challenges several penalty-phase instructions as well. However, since defense counsel failed to object to the instructions as given, the asserted errors are reviewed under the plain-error standard. *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804. Under this standard, and after fully reviewing the alleged errors, we find no merit

in appellant's arguments. We overrule proposition of law thirteen.

### IV

### SUFFICIENCY AND MANIFEST WEIGHT OF EVIDENCE

{¶ 45} In his eighteenth proposition of law, appellant challenges the sufficiency of the evidence on his aggravated murder convictions. In reviewing the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis *sic.*) *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573.

{¶ 46} In particular, appellant contends that his aggravated murder convictions must be reversed because the evidence is insufficient to prove that he purposely killed the victim or that he acted with prior calculation and design. According to appellant, the evidence reveals that he fired the gun instantaneously after cocking it and that what occurred was simply a spontaneous eruption of events. Therefore, appellant argues that he lacked the specific intent to commit aggravated murder and that there was no prior calculation and design.

{¶ 47} The fatal shooting of Antwuan Gilliam was not simply a spontaneous or instantaneous act. Appellant and his accomplice (Grant) discussed which of the victims to shoot. When Grant instructed appellant to shoot one of the others, appellant said, "No, I'm going to shoot him [Gilliam]." He also told Gilliam, "I don't give a fuck about killing you," indicating that his purpose was to kill, not just to wound or threaten him. These actions are sufficient to prove purpose to kill.

{¶ 48} Furthermore, as to the argument regarding insufficient evidence of prior calculation and design, we are cognizant of the fact that there is no bright-line test to determine the presence or absence of this requirement and understand that each case must be decided on its own facts. *State v. Taylor* (1997), 78 Ohio St.3d

15, 19-20, 676 N.E.2d 82, 88-89. Although we have declined to uphold a finding of prior calculation and design in some explosive situations of short duration (see, *e.g.*, *State v. Reed* [1981], 65 Ohio St.2d 117, 19 O.O.3d 311, 418 N.E.2d 1359), the facts adduced here show that this case is not one in which there was simply an instantaneous eruption of events. Instead, the evidence reveals that just prior to the shooting, appellant had time to reflect about his actions and to decide which individual to shoot. When combined with the fact that appellant discussed this specific course of action with his cohort, and then followed through on that action, we believe that the evidence showed that appellant gave studied consideration to killing Gilliam. Accordingly, we find that the state presented sufficient evidence to support a finding that appellant " 'adopted a plan to kill' " and that he acted with prior calculation and design in carrying out that plan. See *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 196, 616 N.E.2d 909, 919, quoting *State v. Toth* (1977), 52 Ohio St.2d 206, 213, 6 O.O.3d 461, 465, 371 N.E.2d 831, 836, overruled on other grounds, *State v. Muscatello* (1978), 55 Ohio St.2d 201, 203, 9 O.O.3d 148, 150, 378 N.E.2d 738, 740, fn. 3.

{¶ 49} Upon a thorough review of the record, we find that the evidence was sufficient to prove appellant's guilt beyond a reasonable doubt. Accordingly, we overrule appellant's eighteenth proposition of law.

{¶ 50} In his nineteenth proposition of law, appellant contends that his aggravated murder convictions are against the manifest weight of the evidence. In capital cases, this court has the power to determine whether the weight of the evidence supports the judgment. *State v. Smith* (1997), 80 Ohio St.3d 89, 102-103, 684 N.E.2d 668, 683-684. A verdict can be against the manifest weight of the evidence even though legally sufficient evidence supports it. *State v. Robinson* (1955), 162 Ohio St. 486, 55 O.O. 388, 124 N.E.2d 148. However, in this case, we find, upon review of the entire record, that appellant's convictions for aggravated murder are not against the manifest weight of the evidence. Appellant's nineteenth

proposition of law is without merit.

## V

## CROSS-EXAMINATION OF PSYCHOLOGIST

{¶ 51} In his twenty-seventh proposition of law, appellant contends that his constitutional rights, his physician-patient privilege, and attorney-client privilege were violated when the trial court allowed Dr. Smalldon to testify as to what appellant told him about the nature and circumstances of the offense. Over objection, Smalldon testified on cross-examination that appellant told him that he had not intended to kill the victim and that he had not realized the bullet hit anyone. Appellant also told Smalldon that the gun went off while he was checking to see if it was loaded.

{¶ 52} Even if these comments were improper, we do not find that they violated any privilege. R.C. 4732.19 places "confidential relations and communications between a licensed psychologist * * * and client * * * upon the same basis as those between physician and patient * * *." R.C. 2317.02(B)(1) provides that, with certain exceptions, a physician shall not testify "concerning a communication made to the physician * * * by a patient in that relation." In that context, communications made by a patient to a physician he or she has consulted for treatment are privileged. Thus, the privilege attaches only where a person consults a doctor for treatment or diagnosis and does not extend to the situation presented here, where a psychologist is hired to render an opinion in preparation for litigation. See *McMillen v. Indus. Comm.* (App.1941), 34 Ohio Law Abs. 435, 37 N.E.2d 632; *State v. Hopfer* (1996), 112 Ohio App.3d 521, 552-553, 679 N.E.2d 321, 341-342.

{¶ 53} Finally, we reject appellant's argument that his Fifth Amendment rights against self-incrimination were violated. Appellant relies on *Estelle v. Smith* (1981), 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359, for support. In that case, the United States Supreme Court found that the defendant's Fifth Amendment

rights were violated when a court-appointed psychiatrist testified as to statements the defendant made to him, without the defendant being given his *Miranda* warnings. The state used these statements in the penalty phase of a capital trial to establish the defendant's future dangerousness (a factor pertinent in the state of Texas). See, also, *Powell v. Texas* (1989), 492 U.S. 680, 109 S.Ct. 3146, 106 L.Ed.2d 551. The situation presented in this case is different from the situation in *Estelle*. Here, it was the defense who requested Smalldon's appointment. Furthermore, the testimony in this case, unlike that in *Estelle*, was not used against the defendant, nor did Smalldon make any unfavorable remarks that were used against appellant. Instead, Smalldon's testimony supports defense counsel's theory and remarks made by appellant himself in his unsworn statement that the shooting of the victim was unintentional. Hence, any error under this proposition of law is harmless and does not mandate reversal. We overrule appellant's twenty-seventh proposition of law.

VI

SENTENCING ISSUES

A

Merger and Sentencing Opinion

{¶ 54} In propositions of law two through seven, and proposition of law twenty, appellant challenges the trial court's sentencing opinion. Appellant contends that the kidnapping specification should have been merged with the aggravated robbery specification. By failing to merge these specifications, appellant argues, the trial court considered duplicative aggravating circumstances. Appellant maintains that, as a result, the court factored into the weighing process an improper aggravating circumstance, thereby violating his constitutional rights.

{¶ 55} In *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph five of the syllabus, we held:

"In the penalty phase of a capital prosecution, where two or more

20

aggravating circumstances arise from the same act or indivisible course of conduct and are thus duplicative, the duplicative aggravating circumstances will be merged for purpose of sentencing. Should this merging of aggravating circumstances take place upon appellate review of a death sentence, resentencing is not automatically required where the reviewing court independently determines that the remaining aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt and that the jury's consideration of duplicative aggravating circumstances in the penalty phase did not affect the verdict."

**{¶ 56}** In *Jenkins* at 198, 15 OBR at 340, 473 N.E.2d 264 at 295, fn. 29, we stated that "implicit within every robbery (and aggravated robbery) is a kidnapping." Therefore, a kidnapping specification merges with an aggravated robbery specification unless the offenses were committed with a separate animus. R.C. 2941.25(B). Thus, when a kidnapping is committed during another crime, there exists no separate animus where the restraint or movement of the victim is merely incidental to the underlying crime. *State v. Logan* (1979), 60 Ohio St.2d 126, 14 O.O.3d 373, 397 N.E.2d 1345, syllabus. However, where the restraint is prolonged, the confinement is secretive, or the movement is substantial, there exists a separate animus as to each offense. *Id.*

**{¶ 57}** As applied to this case, we find that the offenses of kidnapping and aggravated robbery were committed with no separate animus, as there is no showing of a prolonged restraint, significant asportation, or secret confinement of the victims. Therefore, we agree with appellant that the kidnapping specification merges with the aggravated robbery specification. Although merger should have taken place, under *Jenkins*, resentencing is not automatically required. Since we do not believe that the outcome of the penalty hearing was affected by the jury's consideration of duplicative aggravating circumstances, and because we find, in our independent review, that the remaining aggravating circumstances outweigh the mitigating circumstances, we conclude that appellant need not be resentenced.

**{¶ 58}** Appellant also argues that the aggravated burglary specification should have been merged with the aggravated robbery specification. However, the aggravated burglary in this case does not merge with the aggravated robbery. As soon as appellant entered the apartment by force armed with a deadly weapon with the intent to commit a theft, the aggravated burglary was completed. R.C. 2911.11; *State v. Frazier* (1979), 58 Ohio St.2d 253, 256, 12 O.O.3d 263, 265, 389 N.E.2d 1118, 1120. Nor does the aggravated burglary merge with the kidnapping in this case. *State v. Waddy* (1992), 63 Ohio St.3d 424, 448, 588 N.E.2d 819, 837.

**{¶ 59}** Appellant also points to three alleged deficiencies in the sentencing opinion itself. First, he contends that the trial judge did not weigh all the mitigating factors collectively against the aggravating circumstances. The law requires that the mitigating factors be considered collectively, not individually. *State v. Dickerson* (1989), 45 Ohio St.3d 206, 213, 543 N.E.2d 1250, 1257. In this case, the sentencing opinion begins by discussing the nature and circumstances of the offense, then turns to appellant's history, character, and background, and concludes by stating that the aggravating circumstances outweigh the mitigating nature of his history, character, and background. However, the opinion then separately discusses the relevant mitigating factors and finds these factors, "considered both *individually* and *collectively*, insufficient to outweigh those aggravating circumstances proven beyond a reasonable doubt at trial." (Emphasis added.) By stating that it considered the mitigating factors individually *and* collectively, the trial court may have erred. However, upon closer review, it is clear from this statement that the court did consider these factors collectively. Thus, the trial court's error, if any, is not prejudicial.

**{¶ 60}** Second, appellant contends that the trial court failed to give full weight to his history, character, and background and that it inappropriately considered the fact that appellant knew right from wrong and understood the egregiousness of murder. We reject this argument and note that the issue of

22

appellant's understanding right from wrong was raised by his own mitigation witnesses. We believe that the trial court gave adequate consideration to appellant's history, character, and background.

{¶ 61} Third, appellant contends that the trial court erred in not considering the psychological testimony of Dr. Smalldon under R.C. 2929.04(B)(7), the catchall factor. Although the court considered this testimony under R.C. 2929.04(B)(3), it did err in failing to consider whether the psychological defects had any mitigating weight under R.C. 2929.04(B)(7). See *State v. Green* (1993), 66 Ohio St.3d 141, 153, 609 N.E.2d 1253, 1263. However, even assuming this defect in the trial court's assessment, this court's independent review will correct any such error. *State v. Landrum* (1990), 53 Ohio St.3d 107, 124, 559 N.E.2d 710, 729.

C

Readmission of Guilt-Phase Evidence

{¶ 62} In his eighth proposition of law, appellant contends that the trial court erred by readmitting all the guilt-phase evidence in the penalty phase. Appellant alleges that evidence as to the killing itself, particularly the gruesome pictures, should have been ruled inadmissible in the penalty phase. We agree that the trial court should exclude evidence relevant to guilt but irrelevant to the penalty phase. *State v. Getsy* (1998), 84 Ohio St.3d 180, 201, 702 N.E.2d 866, 887. However, because the trial court must consider the nature and circumstances of the offense, R.C. 2929.03(D)(1) "permit[s] repetition of much or all that occurred during the guilt stage." *State v. DePew* (1988), 38 Ohio St.3d 275, 282-283, 528 N.E.2d 542, 552. In *DePew*, this included readmission of photographs. We overrule appellant's eighth proposition of law.

VII

INEFFECTIVE ASSISTANCE OF COUNSEL

**{¶ 63}** In his twenty-sixth proposition of law, appellant contends that his constitutional rights were violated because he was denied effective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's representation was deficient and that he was prejudiced by that deficient performance. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693. To establish prejudice, the defendant must show that "there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.

**{¶ 64}** Appellant contends that trial counsel's performance was deficient in several respects. Appellant argues that four prospective jurors were biased and that trial counsel was ineffective in failing to attempt to strike these individuals for cause. We reject this argument. Defense counsel struck three of these prospective jurors by exercising peremptory challenges. The fourth individual, Richards, was seated on the jury and was not challenged for cause or in a peremptory challenge. Appellant concedes that Richards's answers to voir dire questions would not support a challenge for cause. Nevertheless, appellant contends that had defense counsel challenged the other three individuals for cause, there would have been a peremptory challenge remaining to remove Richards, who appellant believes was biased. Although juror Richards initially expressed some concern about considering mitigating circumstances, he made it clear that he would follow the law and that he would recommend an appropriate sentence based upon the law. See *State v. Davis* (1991), 62 Ohio St.3d 326, 350, 581 N.E.2d 1362, 1381-1382. Since appellant cannot demonstrate that this juror's views would impair the performance of his duties according to the court's instructions, see *State v. Rogers*, 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus, there is no

showing that appellant was prejudiced by defense counsel's failure to use a peremptory challenge to remove juror Richards.

{¶ 65} Appellant also contends that trial counsel was defective in failing to timely challenge the racial make-up of the venire. Defense counsel challenged the venire in open court, alleging that the array did not constitute a fair cross-section of the community, since only one individual out of fifty in the array was black. The court denied the motion as untimely, since voir dire had already begun, citing Crim.R. 24(E), and noted that nothing indicated that the array was chosen in any manner other than random selection from the voting public.

{¶ 66} A defendant is entitled to a jury "drawn from a source fairly representative of the community." *Taylor v. Louisiana* (1975), 419 U.S. 522, 538, 95 S.Ct. 692, 701, 42 L.Ed.2d 690, 700. Although defense counsel should have objected before voir dire commenced, see Crim.R. 24(E), appellant fails to show a "reasonable probability" that were it not for this error, the result of the trial would have been different. *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.

{¶ 67} Appellant further claims that trial counsel did not adequately prepare for the penalty phase of the trial. On Friday, October 24, 1997, four days before the penalty phase began, defense counsel advised the court that he had not yet had a chance to speak with Dr. Smalldon and that he had only an hour to confer with him that day. Defense counsel also stated that he would not receive any mitigation material from the expert until the next day and that he would have to prepare his witnesses over the weekend. Appellant contends that this lack of preparation is tantamount to ineffective assistance of counsel. Contrary to appellant's assertion, a review of the record does not demonstrate that defense counsel was unprepared at the penalty phase of the trial. In fact, defense counsel called several witnesses, including family members, as well as Dr. Smalldon, on appellant's behalf. It is evident from the line of questioning of these witnesses that defense counsel was

prepared and that he was able to effectively present the mitigation testimony.

{¶ 68} Appellant further argues that defense counsel was ineffective in failing to move to dismiss counts of the indictment or to request merger of the aggravating circumstances. While we agree that counsel should have certainly been aware of the fact that merger was required, appellant fails to establish any prejudice.

{¶ 69} Appellant also says that counsel should have objected to various unspecified errors. However, "[t]he failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel." *State v. Holloway* (1988), 38 Ohio St.3d 239, 244, 527 N.E.2d 831, 837. Since appellant does not show that any particular failure to object substantially violated any essential duty or was prejudicial, we reject this claim of ineffective assistance of counsel.

{¶ 70} In the penalty phase, during a bench conference, the bailiff allowed jurors to use the restroom without the court's permission. Appellant contends that trial counsel should have asked the court for a hearing to determine what, if anything, was discussed by the jurors during this unauthorized break. Throughout the trial, the trial judge repeatedly admonished the jury not to discuss the case among themselves or with anyone else during recesses. Since there is no indication of any juror misconduct, we find that appellant has not shown that a hearing was necessary or that he was prejudiced in any way by this omission. We overrule appellant's twenty-sixth proposition of law.

VIII

CUMULATIVE ERROR

{¶ 71} Appellant argues in his twenty-eighth proposition of law that the cumulative effect of the errors in this case denied him a fair trial. Although a particular error might not constitute prejudicial error in and of itself, a conviction may be reversed if the cumulative effect of the errors deprives the defendant of a fair trial. *State v. DeMarco* (1987), 31 Ohio St.3d 191, 31 OBR 390, 509 N.E.2d 1256, paragraph two of the syllabus; *State v. Moore* (1998), 81 Ohio St.3d 22, 41,

689 N.E.2d 1, 18. We find that appellant received a fair trial and a fair sentencing determination. Accordingly, we reject appellant's twenty-eighth proposition of law.

IX

INDEPENDENT SENTENCE REVIEW

{¶ 72} Pursuant to R.C. 2929.05(A), we must independently review the facts and other evidence to determine whether the evidence supports the finding of the aggravating circumstances. Appellant was convicted of three aggravating circumstances: aggravated burglary, aggravated robbery, and kidnapping. However, since kidnapping merges into the aggravated robbery, there remain two aggravating circumstances to look at: aggravated burglary and aggravated robbery. After independent sentence assessment, we find that the evidence supports the aggravating circumstances. We now weigh the facts and evidence in the record to determine whether the aggravating circumstances of which appellant was convicted outweigh the mitigating factors beyond a reasonable doubt.

{¶ 73} There is nothing mitigating in the nature and circumstances of the offense. After forcing his way into the apartment, appellant aimed his gun at Antwuan Gilliam and threatened to shoot him. Even though appellant's cohort (Grant) told appellant not to shoot Gilliam, but to shoot Franklin, appellant made the conscious decision to shoot Gilliam. Gilliam pleaded for his life, but appellant merely said, "I don't give a fuck about killing you," and then pulled the trigger. This was a cold-blooded killing that has no mitigating features.

{¶ 74} Appellant's history, character, and background provide some mitigating weight. Various family members and relatives testified that appellant grew up in a poor, violent, and drug-ridden environment. They testified that appellant's father abused him and his siblings by throwing them against a wall, beating them with his fists or a belt, shooting them with a BB gun, and waking them up for beatings. Due to his parents' work schedule, appellant got little attention

from his parents and was basically left to care for himself, with some supervision by his older sister. He began regularly using alcohol by age twelve. Appellant's siblings described him as a follower, easily manipulated. His sister testified that he could never decide for himself between right and wrong but let others decide for him. Yet she also said that he "knows what happened is wrong," and other family members testified that he knew right from wrong. Witnesses described appellant as quiet, polite, respectful, kind, and helpful, and relatives expressed great love for appellant. However, none of these facts is entitled to great weight in mitigation. Cf. *State v. Cooey* (1989), 46 Ohio St.3d 20, 41, 544 N.E.2d 895, 919; *State v. Berry* (1995), 72 Ohio St.3d 354, 364-365, 650 N.E.2d 433, 442-443.

{¶ 75} With respect to the statutory mitigating factors, very few are present. Since the victim of the offense did not induce or facilitate it and because we do not believe that appellant was under duress, coercion, or strong provocation, the factors listed in R.C. 2929.04(B)(1) and (2) are inapplicable. The factors listed in R.C. 2929.04(B)(5) and (6) are inapplicable as well.

{¶ 76} Under R.C. 2929.04(B)(3), we are asked to consider whether appellant, at the time the offense was committed, suffered from a mental defect causing him to lack substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. Dr. Smalldon testified that appellant had a low IQ of eighty, near the borderline range of mild mental retardation, and that appellant has a personality disorder with antisocial and narcissistic features. These traits do not meet the criteria of mental diseases or defects under R.C. 2929.04(B)(3). However, they are entitled to some weight under R.C. 2929.04(B)(7). *State v. Keene* (1998), 81 Ohio St.3d 646, 670, 693 N.E.2d 246, 265-266.

{¶ 77} Under R.C. 2929.04(B)(4), the youth of the offender is a factor to be considered. However, this factor is entitled to little weight, since appellant was twenty-three years old when he committed the crime. See *State v. Dunlap* (1995),

73 Ohio St.3d 308, 319, 652 N.E.2d 988, 998; *State v. Ballew* (1996), 76 Ohio St.3d 244, 257, 667 N.E.2d 369, 382.

{¶ 78} Under the catchall provision of R.C. 2929.04(B)(7), appellant's alcohol-abuse problems are entitled to some weight. *State v. Green* (1993), 66 Ohio St.3d 141, 153, 609 N.E.2d 1253, 1263. Also, his low intelligence is a mitigating factor given slight weight under R.C. 2929.04(B)(7). See *State v. Rojas* (1992), 64 Ohio St.3d 131, 143, 592 N.E.2d 1376, 1387. Furthermore, Dr. Smalldon testified that appellant had exhibited a positive attitude when confined to the Department of Youth Services. In Smalldon's opinion, appellant would probably continue to do well in an institutional setting such as jail. This is entitled to some weight in mitigation. However, contrary to appellant's position, a lesser sentence given to his accomplice is not a mitigating factor because appellant was the principal offender in this case.

{¶ 79} Based upon the foregoing, we find that the aggravating circumstances outweigh the mitigating factors present in this case beyond any reasonable doubt. The evidence revealed that appellant threatened Antwuan Gilliam during the course of a robbery involving drugs and shot him in the head even after Gilliam pleaded for his life. His actions merit the capital penalty to which he was sentenced. Furthermore, we find that the death penalty in this case is neither excessive nor disproportionate when compared with the penalty imposed in similar cases involving aggravated murder during an aggravated burglary and aggravated robbery. *State v. Murphy* (1992), 65 Ohio St.3d 554, 605 N.E.2d 884; *State v. Slagle* (1992), 65 Ohio St.3d 597, 605 N.E.2d 916; *State v. Lott* (1990), 51 Ohio St.3d 160, 555 N.E.2d 293.

{¶ 80} Accordingly, the judgment of the trial court is affirmed, with the exception that we set aside appellant's kidnapping convictions, which we hold merge with his aggravated robbery convictions.

*Judgment affirmed.*

DOUGLAS, RESNICK, COOK and LUNDBERG STRATTON, JJ., concur.

MOYER, C.J., and PFEIFER, J., concur in part and dissent in part.

_____

**MOYER, C.J., concurring in part and dissenting in part**.

{¶ 81} Time and time again this court has commented on the impropriety of a prosecutor's argument throughout the course of a capital case. Time and time again we have given prosecutors the benefit of the doubt, declaring their conduct to be nonprejudicial in view of overwhelming evidence of guilt.

{¶ 82} However, despite our best efforts to clarify the limits of acceptable advocacy, and our stern warnings to avoid such inappropriate conduct in the future, some prosecutors continue to unabashedly cross the line of vigorous but proper advocacy. In doing so, they taint the fairness of our criminal justice system.

{¶ 83} Such conduct has been recognized by our state and federal judges throughout history as a challenge to the very foundation of our system of criminal justice. See, *e.g., State v. Keenan* (1993), 66 Ohio St.3d 402, 613 N.E.2d 203 (convictions and death penalty reversed); *State v. Thompson* (1987), 33 Ohio St.3d 1, 514 N.E.2d 407 (death sentence reversed); *State v. Smith* (1984), 14 Ohio St.3d 13, 14 OBR 317, 470 N.E.2d 883 (conviction reversed and cause remanded for new trial); *State v. Liberatore* (1982), 69 Ohio St.2d 583, 23 O.O.3d 489, 433 N.E.2d 561 (conviction reversed and cause remanded for new trial); *United States v. Kojayan* (C.A.9, 1993), 8 F.3d 1315, 1323; *Walker v. Engle* (C.A.6, 1983), 703 F.2d 959; *Darden v. Wainwright* (1986), 477 U.S. 168, 205-206, 106 S.Ct. 2464, 2484, 91 L.Ed.2d 144, 172-173 (Blackmun, J., dissenting, joined by Brennan, Marshall, and Stevens, JJ.); *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 648-649, 94 S.Ct. 1868, 1874, 40 L.Ed.2d 431, 439-440 (Douglas, J., dissenting); *United States v. Antonelli Fireworks Co*. (C.A.2, 1946), 155 F.2d 631, 661 (Frank, J., dissenting).

{¶ 84} The United States Supreme Court has explicitly recognized that

prosecutors serve a special role in our justice system requiring them to adhere to the highest standards and to avoid improper arguments, insinuations, and assertions calculated to mislead the jury. The role of the prosecutor is to ensure "not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor — indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States* (1935), 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1321.

{¶ 85} Over ten years ago, we, ourselves, noted our "mounting alarm" over the increasing incidence of misconduct by prosecutors. *State v. DePew* (1988), 38 Ohio St.3d 275, 288, 528 N.E.2d 542, 556. Commenting on the misconduct of the assistant prosecutors, we said: "We have previously voiced our disapproval of the various forms of misconduct by counsel in such cases. * * * Apparently, our efforts in this regard have been something less than successful, and the avenues for prevention and correction by trial courts, appellate courts and this court are relatively few. Time and again we see counsel misconduct which in many cases would appear to be grounds for reversal and the vacating of convictions and/or sentences. * * *

"* * *

"* * * Attorneys, trial courts, courts of appeals and this court should remain ever vigilant regarding the duties of counsel as exemplified in the [Code of Professional Responsibility]." *Id.* at 288, 528 N.E.2d at 556-557.

{¶ 86} Yet prosecutorial misconduct has not abated in the more than ten years since *DePew*. Nearly all the members of this court over the last several years have expressed their concern regarding the proclivity of some prosecutors to ignore

our warnings.[1]

{¶ 87} Clearly, our protestations have failed to change the advocacy of some prosecutors. It is as if they intentionally engage in improper conduct, safe in the belief that this court will continue to protest with no consequences. In the interest of the integrity of the criminal justice system in this state, we must demonstrate that our protestations are more than utterings of frustration.

{¶ 88} The majority opinion joins a long list of well-meaning and apparently ineffective admonishments to the prosecutors of this state. The majority clearly expresses its disapproval of the conduct of the prosecutors in this case,[2] but provides no consequence or disincentive for the continuation of such conduct. Instead, the majority offers the following:

"For the reasons that follow, although we find no reversible error, we express our deep concern over some of the remarks and misstatements made by the

1. Though the following is not a comprehensive listing of all the capital cases in which this court has addressed some form of prosecutorial misconduct, the following capital cases, all decided after our decision in *DePew*, involve prosecutorial misconduct that has been criticized by this court. See, *e.g.*, *State v. Keenan* (1993), 66 Ohio St.3d 402, 405-409, 613 N.E.2d 203, 206-209 (reversed and remanded for new trial); *State v. Raglin* (1998), 83 Ohio St.3d 253, 699 N.E.2d 482; *State v. Getsy* (1998), 84 Ohio St.3d 180, 702 N.E.2d 866; *State v. Davie* (1997), 80 Ohio St.3d 311, 686 N.E.2d 245; *State v. Henness* (1997), 79 Ohio St.3d 53, 679 N.E.2d 686; *State v. Davis* (1996), 76 Ohio St.3d 107, 666 N.E.2d 1099; *State v. Brooks* (1996), 75 Ohio St.3d 148, 661 N.E.2d 1030; *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 662 N.E.2d 311; *State v. Hill* (1996), 75 Ohio St.3d 195, 661 N.E.2d 1068; *State v. Lundgren* (1995), 73 Ohio St.3d 474, 653 N.E.2d 304; *State v. Williams* (1995), 73 Ohio St.3d 153, 652 N.E.2d 721; *State v. Lorraine* (1993), 66 Ohio St.3d 414, 613 N.E.2d 212; *State v. Evans* (1992), 63 Ohio St.3d 231, 586 N.E.2d 1042; *State v. Murphy* (1992), 65 Ohio St.3d 554, 605 N.E.2d 884; *State v. Combs* (1991), 62 Ohio St.3d 278, 581 N.E.2d 1071; *State v. Durr* (1991), 58 Ohio St.3d 86, 568 N.E.2d 674; *State v. Wiles* (1991), 59 Ohio St.3d 71, 571 N.E.2d 97; *State v. Tyler* (1990), 50 Ohio St.3d 24, 553 N.E.2d 576; *State v. Lott* (1990), 51 Ohio St.3d 160, 555 N.E.2d 293; *State v. Landrum* (1990), 53 Ohio St.3d 107, 559 N.E.2d 710; *State v. Hutton* (1990), 53 Ohio St.3d 36, 559 N.E.2d 432; *State v. Johnson* (1989), 46 Ohio St.3d 96, 545 N.E.2d 636; *State v. Greer* (1988), 39 Ohio St.3d 236, 530 N.E.2d 382; *State v. Bedford* (1988), 39 Ohio St.3d 122, 529 N.E.2d 913.

2. The state was represented in this case by two assistant prosecutors. Both counsel engaged in similar forms of misconduct and neither was limited to isolated incidents. Because the misconduct of both prosecutors is of a similar nature and degree, and because such misconduct is representative of prosecutorial misconduct in other cases and in other counties, this opinion will not differentiate between the individual prosecutors when discussing the improper conduct at issue in this case.

prosecutors involved in this case. While we realize the importance of an attorney zealously advocating his or her position, we cannot emphasize enough that prosecutors of this state must take their roles as officers of the court seriously. As such, prosecutors must be diligent in their efforts to stay within the boundaries of acceptable argument and must refrain from the desire to make outlandish remarks, misstate evidence, or confuse legal concepts. Nevertheless, because we find that none of the errors complained of rises to the level of plain error, we do not reverse this case based upon prosecutorial misconduct." "Although we are greatly disturbed by Prosecutor Russell's and Prem's lack of restraint and their willingness to utter such inflammatory remarks, we cannot say that these comments constitute reversible error. * * * If this kind of activity continues, it is just a matter of time before it affects the outcome of a trial."

{¶ 89} As Judge Jerome Frank stated in his often-cited dissent in *United States v. Antonelli Fireworks Co., Inc.* (C.A.2, 1946), 155 F.2d at 661, the repeated use of vigorous language denouncing prosecutors for improper conduct, without more, constitutes an "attitude of helpless piety * * *. It means actual condonation of counsel's alleged offense, coupled with verbal disapprobation. If we continue to do nothing practical to prevent such conduct, we should cease to disapprove it. For otherwise * * * [t]he deprecatory words we use in our opinions on such occasions are purely ceremonial. * * * The practice * * * breeds a deplorably cynical attitude towards the judiciary."

{¶ 90} As demonstrated by the pattern of misconduct we have been reviewing, Judge Frank's observation that prosecutors are willing to suffer such verbal chastisement in order to ensure victory, despite the cost to our justice system, has been proven true.

{¶ 91} Often, in these cases, we have based our final determination on the grounds that the verdict and the penalty are justified under the ever-expanding realm of harmless error. While it is true that "the touchstone of due process analysis

in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor," *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78, 87, it is also true that many of our opinions have focused on the sufficiency of the admissible evidence and our ability to perform an independent review of the penalty rather than focusing on the fairness of the original trial itself.

{¶ 92} Refusing to address the fundamental unfairness of a trial riddled with prosecutorial misconduct because a majority of this court deems the evidence of guilt to be overwhelming creates the perception that we protect the right to a fair trial only when we believe that the defendant is not guilty. However, our constitutional duty is to ensure that all defendants, regardless of guilt or innocence, receive a fair trial, and to ensure that a person accused is presumed innocent until the state, within the bounds of due process, satisfies its burden of proving beyond a reasonable doubt all of the elements of the charged offense, and the appropriateness of the imposed sentence. See, also, R.C. 2901.05(A). In order to accomplish this constitutional goal, the General Assembly has limited the information available to the jury at both the guilt and penalty phases of a capital trial to ensure that the jury's deliberations are not tainted by irrelevant, inflammatory, or otherwise improper factors.

{¶ 93} These protections become even more important when the same jury that determines a defendant's guilt is also responsible for recommending whether that defendant will live or die once convicted. Due process requires that the sentencing phase of a capital trial not be unduly influenced by passion, prejudice, or any other arbitrary factor. With a human life at stake, a prosecutor should not play on the passions of the jury. *Keenan*, 66 Ohio St.3d at 407, 613 N.E.2d at 207. Thus, even though I agree that the prosecutorial misconduct in this case may not have affected the overall fairness of the guilt phase, it is impossible to say that impropriety in both the guilt and penalty phases did not in any way affect the jury's

deliberations regarding the penalty to be imposed.

{¶ 94} The United States Supreme Court has reiterated that allowing affirmance of a conviction simply because the otherwise admissible evidence is sufficient to support the verdict is not the proper harmless error standard. Such a standard would be "a much more lenient rule" that would make the offensive evidence or conduct "virtually risk-free for the State." *Arizona v. Fulminante* (1991), 499 U.S. 279, 309, 111 S.Ct. 1246, 1264, 113 L.Ed.2d 302, 331. In order to find an error harmless in the guilt phase, it must be clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would have found the defendant guilty. *State v. Smith*, 14 Ohio St.3d at 15, 14 OBR at 319, 470 N.E.2d at 886. However, if the error amounts to a violation of due process, it vitiates the judgment even where there is sufficient other evidence to support a judgment of conviction. *Arizona v. Fulminante, supra*.

{¶ 95} The harmless error standard is even more stringent when applied to errors committed at the penalty phase of a capital trial. "The question * * * is not whether the legally admitted evidence was sufficient to support the death sentence, which we assume it was, but rather, whether the State has proved 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " *Satterwhite v. Texas* (1988), 486 U.S. 249, 258-259, 108 S.Ct. 1792, 1798, 100 L.Ed.2d 284, 295, quoting *Chapman v. California* (1967), 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710. This standard is recognized by the Sixth Circuit as a "stringent harmless error standard." *Kordenbrock v. Scroggy* (C.A.6, 1990), 919 F.2d 1091, 1097. Under this standard, the burden is on the state, the beneficiary of the error, to prove beyond a reasonable doubt that the jury's sentencing recommendation was not based *even in part* upon the error.

{¶ 96} The majority opinion, and many of our past decisions, tends to focus on the potential prejudicial effect of each separate error, ignoring or summarily dismissing errors to which there was no objection, as well as the potential for

cumulative error. However, Ohio jurisprudence and federal constitutional law have long recognized that errors, whether or not they are independently prejudicial, must be considered for their cumulative effect on the defendant's due process rights. This includes even those errors to which defense counsel did not object. See, *e.g., State v. Keenan*, 66 Ohio St.3d at 410, 613 N.E.2d at 209-210; *Walker v. Engle*, 703 F.2d at 963, citing *United States v. Jones* (C.A.D.C.1973), 482 F.2d 747; *Newsom v. United States* (C.A.5, 1962), 311 F.2d 74; *United States v. Maroney* (C.A.3, 1967), 373 F.2d 908; and *State v. Liberatore*, 69 Ohio St.2d at 589-590, 23 O.O.3d at 493, 433 N.E.2d at 566-567.

{¶ 97} In *Berger v. United States* 295 U.S. at 85, 55 S.Ct. at 632, 79 L.Ed. at 1320, the United States Supreme Court noted the importance of viewing prosecutorial misconduct in the context of the entire proceeding: "It is impossible, however, without reading the testimony at some length, and thereby obtaining a knowledge of the setting in which the objectionable matter occurred, to appreciate fully the extent of the misconduct." The court further noted that "we have not here a case where the misconduct of the prosecuting attorney was slight or confined to a single instance, but one where such misconduct was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential." *Id*. at 89, 55 S.Ct. at 633, 79 L.Ed. at 1321. The court also recognized that the mere sustaining of objections may not be sufficient to cure such pervasive misconduct. *Id.* at 85, 55 S.Ct. at 632-633, 79 L.Ed. at 1320.

{¶ 98} Considering the stringent standard to be applied in determining harmless error, and the cumulative effect of the errors complained of, I agree with the majority that, considering the record as a whole, the errors in the guilt phase of the trial did not violate the defendant's due process rights and are otherwise not so prejudicial as to require a reversal of his conviction. I reemphasize, however, the majority's caution regarding the prosecutor's improper comments, some of which could be construed as comment on the appellant's failure to testify. Prosecutors as

well as defense counsel should be very careful in their presentation of argument and their word choice. A poorly worded or ill-prepared statement can, even inadvertently, encroach upon the fairness of the trial.

PENALTY PHASE

{¶ 99} In regard to the penalty phase of the trial, I must respectfully dissent from the decision of the majority. I believe that the type and number of prejudicial errors that occurred throughout the trial cumulatively denied the defendant his due process rights to a fair and impartial trial on the penalty to be assigned.

{¶ 100} The defendant's first proposition of law argues that the prosecutors improperly argued nonstatutory aggravating factors. The majority acknowledges that the prosecutor improperly referred to the terror appellant allegedly inflicted on Derrick Frazier as "an aggravating circumstance," misstated the law, improperly presented the nature and circumstances of the offense as an "aggravating circumstance" to be weighed against the mitigating evidence, and implied that mitigation must outweigh aggravation. This is the most fundamental and clearly defined type of misconduct in which a prosecutor may engage in the penalty phase of a capital trial. It goes to the very core of the entire sentencing process. Injecting improper considerations into the weighing process impermissibly tips the scales in favor of the state, and the type of factors involved here clearly involves an attempt to inflame the jury and improperly appeal to their emotions.

{¶ 101} We have provided clear and unambiguous direction specifically disallowing this type of argument. "Again and again and again, we hold that in the penalty phase of a capital trial, the 'aggravating circumstances' against which the mitigating evidence is to be weighed are limited to the [statutory specifications] that have been alleged in the indictment and proved beyond a reasonable doubt." *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 356, 662 N.E.2d 311, 322. We provided syllabus law expressly on point to eliminate any confusion: "It is improper for prosecutors in the penalty phase of a capital trial to make any comment

before a jury that the nature and circumstances of the offense are 'aggravating circumstances.' " *Id.* at paragraph two of the syllabus.

{¶ 102} It is only fair to presume, considering the clarity of the law on this issue, the objection by defense counsel, and the repeated nature of the misconduct, that the prosecutors' comments were not mere misstatements or inadvertent assertions made in the heat of the moment. Yet, the majority, despite the blatant violation of syllabus law and statutory law, despite the clear attempt to appeal repeatedly to the emotions of the jury, and despite two defense objections that were overruled by the trial court, applies a plain error standard and finds the conduct nonprejudicial.

{¶ 103} Added to the prejudicial effect of these improper arguments is the fact that the jury in this case was also improperly presented with duplicative statutory aggravating circumstances, because the trial court did not merge the kidnapping and the aggravated robbery circumstances until after the jury had made its recommendation. Thus, the state was improperly favored in the weighing process, contrary to the statutory mandates and despite the fact that the state bears the burden of proof. R.C. 2929.03(D)(1). It is also significant that the jury deliberated for nine hours and told the court on the record that its decision was difficult. Therefore, we should not presume that these improper considerations had no effect on the jury's recommendation.

## DENIGRATION OF OPPOSING COUNSEL

{¶ 104} We are not unmindful of the reality that effective advocates will at times offer descriptions of opposing counsel that would not be heard outside the courtroom. Indeed, we have repeatedly permitted some advocates for the state to bend our own rules in death penalty cases. The conduct of the attorneys for the state in this case has bent the rules beyond the breaking point.

{¶ 105} Comments which impute insincerity to defense counsel are improper. See *State v. Keenan*, 66 Ohio St.3d at 405, 613 N.E.2d at 206-207; *State*

*v. Smith*, 14 Ohio St.3d at 14, 14 OBR at 318-319, 470 N.E.2d at 885; EC 7-37. While cross-examining Dr. Smalldon, the prosecutor referred to defense counsel as the defendant's "mouth piece." Because defense counsel objected to this statement and the court sustained the objection, instructing the jury to disregard it, the majority deems it nonprejudicial. I would agree if this were counsel's only misstatement, but unfortunately the transcript reveals other instances in which the prosecutor intentionally denigrated defense counsel. During cross-examination of Dr. Smalldon and in closing arguments, the prosecutor repeatedly implied that defense counsel was improperly keeping information from the jury that was relevant to their decision despite a court ruling that this information was not available to the state or the jury. Various objections were entered during the cross-examination, some of which were sustained, and some of which were overruled.

{¶ 106} During closing arguments of the guilt phase, the prosecutor compared defense counsel to a magician and insinuated that he was attempting to trick the jury and was not telling the truth: "And what does the magician say how it happened? Does he tell you the truth? He says, 'It's magic.'

"Some people say it would be magic. But is that the truth? No. The truth is it's a slight [*sic*] of hand technique, a trick.

"* * *

"The magic thing sounds good, but that's not the truth."

{¶ 107} While these comments may not in and of themselves justify reversal of the death sentence in this case, they do demonstrate clear error and add to the overall unfairness of the proceedings.

{¶ 108} Error during the guilt phase that was deemed harmless as to the verdict of guilt may taint the jury in the penalty phase and is therefore relevant to this discussion. We acknowledged in *State v. Thompson* that "we would be naïve not to recognize that those matters which occur in the guilt phase carry over and become part of the entire proceeding as the penalty phase is entered. The type and

magnitude of any error then becomes at issue." *Id*., 33 Ohio St.3d at 15, 514 N.E.2d at 421. When the "mouth piece" comment is viewed in conjunction with these other attempts to denigrate the defense counsel, I do not find the comments to be so easily dismissed.

APPEALING TO THE PECUNIARY INTERESTS OF THE JURORS

{¶ 109} During the cross-examination of Dr. Smalldon, and the closing arguments of the penalty phase, the prosecutor elicited testimony and argued to the jury that the defendant's witness was being paid for his testimony with taxpayer money. A defense objection was overruled. In addition, the prosecutor implied that the charges being born by the taxpayer were excessive.

{¶ 110} The majority, once again, recognizes the impropriety of such comments but, though it does not explicitly find the argument to be nonprejudicial, it dismisses the comments because they do not rise to the level of prejudice found in *State v. Keenan*, 66 Ohio St.3d 402, 613 N.E.2d 203. If improper actions are prejudicial, reversal is in order. *Keenan* was never set forth as the minimum level of prejudice required for a death penalty reversal. We have clear syllabus law that directly supports the contention that statements in closing argument appealing directly to the pecuniary interests of the jury are highly improper and can constitute prejudicial error if not adequately addressed by the trial court. See *State v. Muskus* (1952), 158 Ohio St. 276, 49 O.O. 122, 109 N.E.2d 15, at paragraph two of the syllabus. In this case the trial court overruled the objection of defense counsel and made no attempt to correct or limit this line of argument.

CROSS-EXAMINATION OF EXPERT WITNESS

{¶ 111} Several additional acts of prosecutorial misconduct resulted from the prosecutors' unwillingness to accept the trial court's ruling limiting the prosecution's access to Smalldon's interview notes and refusing to require Smalldon to reduce his opinion to a written report. The prosecution, despite this ruling and despite the ample opportunity to argue its point to the judge, made

several comments about the notes and the absence of a written report in the presence of the jury. The prosecutor repeatedly asked Smalldon whether he provided these notes or a report to the state. The defense objected to these references and the trial court sometimes sustained and sometimes overruled the objections.

{¶ 112} The prosecutor told the jury that relevant facts were not in evidence and insinuated that the state was prejudiced by not being able to review that information. The prosecutor also insinuated that Dr. Smalldon was inappropriately withholding information from the state and that both he and defense counsel were attempting to hide relevant information from the jury. The prosecutor even told Smalldon in the presence of the jury that he needed to make a report to the jury so that the jurors could know where the inconsistencies were in the defendant's record and in Smalldon's evaluation. This statement of course also implies that the prosecutor was aware of inconsistencies and that they were relevant to the testimony of the doctor. An objection was sustained but no curative instruction was given.

{¶ 113} The majority recognizes this as improper conduct and recognizes that it had the effect of falsely impugning the reputation of Dr. Smalldon, who was potentially defendant's most important mitigation witness. Yet, again, the majority dismisses this intentional, improper course of conduct.

{¶ 114} I cannot agree with the majority's conclusion. This court and the United States Supreme Court have recognized the danger of this type of misconduct, where the prosecutor attempts to denigrate defense counsel and defense witnesses. "[I]mproper suggestions, insinuations, and, especially, assertions of personal knowledge [by the prosecution] are apt to carry much weight against the accused when they should properly carry none." *Berger v. United States,* 295 U.S. at 88, 55 S.Ct. at 633, 79 L.Ed. at 1321.

{¶ 115} The state has offered no evidence or argument sufficient to show beyond a reasonable doubt that these instances of misconduct did not contribute to

the jury's recommendation. To the contrary, the record indicates that the jury was well aware of and focused on the dispute regarding Dr. Smalldon's notes, the absence of a written report, and other questions regarding Smalldon's credentials that elicited sustained objections. Though they should never have been made aware of the existence of the notes, the absence of those notes was considered. Though some objections to improper questions regarding Smalldon's credentials were sustained, it is clear from the transcript that the jurors did not eliminate from their minds the not so subtle inferences created by the prosecutors.

{¶ 116} The transcript includes a question-and-answer session conducted with the jury members following their recommendation and prior to the actual sentencing. That session provides unusually direct evidence suggesting that this instance of prosecutorial misconduct did affect the jury's deliberation:

"Juror Guilfoyle: I want you to tell me what was off the record about the little doctor. Why he couldn't go into that  * * * . Why he didn't take his board test in '96.

"The Court: One of the things I'm sure you picked up on Dr. Smalldon is he does not write a written report.

"Mr. Rosenwald [Defense Counsel]: Which he doesn't have to.

"Mrs. Russell [Assistant Prosecuting Attorney]: But he could if he wanted to.

"Mr. Rosenwald: Yes, but we asked him not to.

"Juror Guilfoyle: We wouldn't have had to deliberate so long if he did.

"A Juror: If — Why would you not?

"Mr. Rosenwald: Because the rules say I have to give them a copy.

"Mrs. Russell: Because I could prepare.

"* * *

"Juror Haerr: It could have been a piece of paper.

"Juror Guilfoyle: She was having a field day.

42

"Juror Haerr: For all we knew, it could have been a box of paper.

"* * *

"Juror Depperman: * * * We were squirming. I was. I didn't know what was going to happen, how long it was going to last, how much longer he was going to be up there.

"I'm trying to work out in my mind when are we going to get the jury charge. * * *

"* * *

"A Juror: * * * When you had the psychologist here as your witness, this was—Were there other people that you could have chosen that were stronger in their background * * * ?"

{¶ 117} This discussion reveals not only that Dr. Smalldon, his credentials, and credibility played a role in the jury determinations, but that at least one member of the jury believed that she did not have what may have been important information about the defendant. This is precisely the effect that the Rules of Evidence attempt to avoid and that the prosecutor's improper conduct was apparently calculated to achieve.

ADDITIONAL MISCONDUCT

{¶ 118} Although I believe that the seriousness of the prosecutorial misconduct already addressed is sufficient to support a reversal of the death penalty and a remand for resentencing, it is important to note that the impropriety of the prosecutors' arguments was not limited to these examples. There were a multitude of other improper remarks made by both prosecutors during cross-examination and closing arguments of the penalty phase.

{¶ 119} Prosecutors repeatedly argued and alluded to facts that were inadmissible or not in evidence. For example, the prosecutor questioned Dr. Smalldon about the defendant's past criminal history, including references to charges for which the defendant had never been convicted. Prosecutors may rebut

false or incomplete statements regarding the defendant's criminal record only where the defense offers a specific assertion, by a mitigation witness or by the defendant, that misrepresents the defendant's prior criminal history. *State v. DePew,* 38 Ohio St.3d at 285, 528 N.E.2d at 554. Neither the defendant nor any of the mitigation witnesses misrepresented his prior criminal history. Thus, the prosecutors' continued attempts to discredit the defendant by introducing additional pieces of his criminal history without independent justification were improper.

{¶ 120} The state also took several opportunities to suggest that the defendant was a member of a gang. The allegations of gang affiliation were presented solely by the prosecutor, were not substantiated or based on admitted evidence, and are highly inflammatory. In addition, we have previously recognized that this type of argument, even if substantiated, is "gravely improper." *Keenan*, 66 Ohio St.3d at 409, 613 N.E.2d at 209. "In relying on the 'thoroughly discredited doctrine' of guilt by association, the prosecutor violated 'a fundamental principle of American jurisprudence, inhabiting a central place in the concept of due process.' *People v. Chambers* (1964), 231 Cal.App.2d 23, 28-29, 41 Cal.Rptr. 551, 555." *Keenan* at 409, 613 N.E.2d at 209. Such arguments are highly prejudicial. *Id.,* citing *United States v. Labarbera* (C.A.5, 1978), 581 F.2d 107, 109.

{¶ 121} In addition to those instances previously discussed and acknowledged by the majority opinion, the prosecutors engaged in the following misconduct directly aimed at skewing the basic weighing process, which is the core of the penalty phase. The prosecutor improperly equated mitigation with justification and a lessening of the crime. The prosecutor also repeatedly argued the nature and circumstances of the crime itself (as differentiated from the nature and circumstances of the aggravating circumstances) as factors to be weighed against the mitigating evidence. In closing arguments, the prosecutor misstated facts, for example stating that the defendant had pistol-whipped one of the robbery victims. This is contrary to all testimony and conflicts with the state's arguments

44

during the guilt phase. Not only was this a misstated fact, but it was characterized as an aggravating circumstance to be weighed against the mitigating evidence. A defense objection was overruled.

{¶ 122} The prosecutors used potential areas of mitigation not raised by the defense to inject improper aggravating factors and to appeal to the emotions of the jury. Though the defense never raised the issue in mitigation, the prosecutor introduced the idea that Fears did not kill Lakesha, another victim of the robbery, or her child, only to turn it around as an improper appeal to the emotions of the jury: "You have to look at the nature and circumstances of the murder. Well, when choosing who to kill and what is right and what is wrong, what are the consequences, he did not hurt a mother or her child, just terrorized them. Just left Lakesha with the dead man and blood in her house." The prosecutor followed this statement with a specific reference to a 911 call, which the majority concedes was improperly admitted at the guilt phase. Though its admission at the guilt phase was harmless error, the error and its prejudicial effect were compounded by its erroneous admission into the penalty phase. See *Thompson,* 33 Ohio St.3d at 15, 514 N.E.2d at 421.

{¶ 123} The admission of this 911 tape and all other evidence not relevant to the aggravating circumstances and not rebutting mitigation evidence first asserted by the defendant violates our holdings in *State v. DePew,* 38 Ohio St.3d 275, 528 N.E.2d 542; *State v. Getsy* (1998), 84 Ohio St.3d 180, 201, 702 N.E.2d 866, 887; and *State v. Gumm* (1995), 73 Ohio St.3d 413, 653 N.E.2d 253, syllabus, as well as R.C. 2929.03(D)(1).

{¶ 124} The majority misstates the statute and misconstrues prior case holdings when it holds that the court must consider the nature and circumstances of the offense and all related evidence. The statute and the case law require the court to consider the nature and circumstances of *the aggravating circumstances* only. The nature and circumstances of the *offense* are to be considered only if raised as a

mitigating factor by the defense. See R.C. 2929.03(D)(1); *DePew,* 38 Ohio St.3d at 289, 528 N.E.2d at 557.

{¶ 125} The state also improperly appealed to the jury by alleging that the system had repeatedly tried to help the defendant in the past and that he had received mere slaps on the wrist for previous offenses. We have held that this type of appeal is potentially prejudicial because the jury may want to punish the defendant for previous crimes that he appears to have somehow "gotten away with." *State v. Hutton* (1990), 53 Ohio St.3d 36, 44, 559 N.E.2d 432, 442.

{¶ 126} This is by no means an exhaustive listing of every improper or potentially prejudicial comment made by the prosecution in this case. Admittedly, if analyzed separately, some of these comments and arguments may seem inconsequential. It is clear, however, that the prosecutors' impropriety pervaded the trial, especially the penalty phase, and when viewed under the strict harmless error standard applied to the penalty phase of a capital trial, the state cannot establish, beyond a reasonable doubt, that the defendant was afforded his due process right to a fair trial.

{¶ 127} For the aforementioned reasons, I would affirm the conviction but reverse the death penalty and remand for resentencing.

PFEIFER, J., concurs in the foregoing opinion.

———————————

APPENDIX

"*Proposition of Law No. 1:* Egregious misconduct by the prosecutor in the penalty phase of capital proceedings requires reversal of the death sentence, and where the prosecutor frequently injects improper and prejudicial matter after defense objections have been sustained, argues nonstatutory aggravating factors, argues 'facts' outside the evidence, employs inflammatory remarks and invective against the accused and his counsel, a death sentence based on a jury verdict following such tactics and arguments violates due process and the Eighth

Amendment of the United States Constitution, and their counterparts in the Ohio Constitution.

"*Proposition of Law No. 2:*  It is impermissible for a sentencer in a capital case to weigh the nature and circumstances of the offense as an aggravating circumstance, to weigh as aggravating an aggravating circumstance which the law requires to be merged with another such circumstance for sentencing purposes, and to weigh the mitigating factors separately (rather than collectively) against the aggravating circumstances, and, where the sentencing opinion of the trial court reveals that such errors occurred in the imposition of the death sentence, the death sentence imposed violates the offender's constitutional rights under the Eighth and Fourteenth Amendments to the U.S. Constitution, and Art. I Secs. 9 and 16 of the Ohio Constitution, and must be reversed.

"*Proposition of Law No. 3:*  Where, as the result of one indivisible course of conduct, a defendant is charged with aggravated robbery, aggravated burglary and kidnapping, with separate capital specifications for each of those felonies, in a prosecution for aggravated murder as well as for the underlying felonies, the trial court must merge the kidnapping specification, the aggravated burglary specification, or both, with the other felony specification prior to the penalty phase, must instruct the jury not to consider the merged specifications separately, and must not itself consider separately the merged aggravating factors in the trial court's sentencing calculations; a death sentence imposed following proceedings where all three capital specifications are considered, and weighed, violates the Eighth Amendment requirement that death sentences be reliable, and be imposed only upon consideration of proper aggravating factors.

"*Proposition of Law No. 4:*  Where capital specifications are duplicative, they must be merged prior to sentencing proceedings, upon motion of the accused, or by the court on its own motion.  The failure of the trial court, *sua sponte*, to merge such specifications constitutes a violation of the rights of the accused under

the United States Constitution and the Ohio Constitution as well where the death sentence is imposed thereafter.

"*Proposition of Law No. 5:* The power conferred by R.C. 2929.05 upon appellate courts to review aggravating and mitigating factors, and to determine the appropriateness of a given death sentence, is subordinate to the right of the accused to trial by jury under Art. I Secs. 5 and 10 of the Ohio Constitution.

"*Proposition of Law No. 6:* Unless it can fairly be held beyond a reasonable doubt that penalty phase error in a capital trial had no effect upon the jury's sentencing verdict, appellate courts are rendered powerless by the right to trial by jury set forth in the Ohio Constitution, Art. I Secs. 5 and 10, from purporting to 'cure' the error and to affirm the death sentence; any such affirmance violates the right of the accused to trial by jury, and the death sentence must be vacated and set aside.

"*Proposition of Law No. 7:* The affirmance of a death sentence by an appellate court which has reweighed the aggravating and mitigating factors absent duplicative and improper aggravating circumstances originally considered and weighed by the jury in recommending the death sentence, constitutes a violation of the right of the accused under the Eighth Amendment to have the death sentence imposed only after the proper procedures have been followed under the state scheme for imposing the death sentence, and also constitutes a violation of the right to due process of law in that such appellate reweighing abrogates the liberty interest created by state law to jury participation in the capital sentencing process.

"*Proposition of Law No. 8:* Only the relevant evidence from the guilt/innocence phase of a capital prosecution may be reintroduced at the penalty phase, and it is a violation of the Eighth Amendment prohibition against cruel and unusual punishment and of the Fourteenth Amendment right to due process of law for the state to introduce, and the trial court to admit, all evidence at the penalty phase which was admitted at the guilt phase, and to instruct the jury to consider

same, and for the trial court itself to consider such evidence in its own sentencing decision.

"*Proposition of Law No. 9:*  Where the state fails to establish beyond a reasonable doubt that aggravation outweighs mitigation beyond a reasonable doubt, the death penalty is absolutely precluded, and the imposition of the death sentence under such circumstances constitutes a violation of the offender's constitutional right to be free of cruel and unusual punishment and also his right to due process of law.

"*Proposition of Law No. 10:*  Under the Ohio capital statutes, for purposes of proportionality review, death sentences must be compared with all other cases within the jurisdiction in which the death sentence was imposed, as well as those capital cases in which it was not imposed.

"*Proposition of Law No. 11:*  The Ohio death penalty statutes are unconstitutional, violating the Eighth Amendment proscription of cruel and unusual punishments, the Fourteenth Amendment guarantees to due process of law and to the equal protection of the laws, and also violating the concomitant provisions of the Ohio Constitution.

"[*Sub-Proposition of Law 11(A):*]  The death penalty is so totally without penological justification that it results in the gratuitous infliction of suffering, and that consequently, there is no rational state interest served by the ultimate sanction.

"[*Sub-Proposition of Law 11(B):*]  Both locally, statewide and nationally, the death penalty is inflicted disproportionately upon those who kill whites as opposed to those who kill blacks, and even within Hamilton County, the death penalty is selectively imposed, rendering the penalty as applied in Hamilton County arbitrary and capricious on the one hand, and the product of racial discrimination on the other.

"[*Sub-Proposition of Law 11(C):*]  The use of the same operative fact to first elevate what would be 'ordinary' murder to aggravated murder, and then to

capital, death-eligible aggravated murder permits the state (1) to obtain a death sentence upon less proof in a felony murder case than in a case involving prior calculation and design, although both crimes are ostensible equally culpable under the Revised Code, and (2) fails to narrow the capital class to those murderers for whom the death penalty is constitutionally appropriate.

"[*Sub-Proposition of Law 11(D):*]   The requirement that a jury must recommend death upon proof beyond a reasonable doubt that the aggravating circumstances outweigh only to the slightest degree the mitigating circumstances renders the Ohio capital statutes quasi-mandatory and permits the execution of an offender even though the mitigating evidence falls just short of equipoise with the aggravating factors, with the result that the risk of putting someone to death when it is practically as likely as not that he deserves to live renders the Ohio capital process arbitrary and capricious, and, in the absence of a requirement that, before death may be imposed, aggravating factors must *substantially* outweigh mitigating factors, unconstitutional.  [Emphasis *sic.*]

"[*Sub-Proposition of Law 11(E):*]   The Ohio capital statutes are constitutionally infirm in that they do not permit the extension of mercy by the jury even though aggravating factors may only slightly outweigh mitigating factors.

"[*Sub-Proposition of Law 11(F):*]  The provisions of Crim.R. 11(C)(3) permitting a trial court to dismiss specifications upon a guilty plea only under the nebulous and undefined concept 'in the interests of justice' (1) needlessly encourages guilty pleas and the concomitant waiver of the right to jury, to compulsory process and to confrontation and (2) reintroduces the possibility that the death sentence will be imposed arbitrarily and capriciously.

"[*Sub-Proposition of Law 11(G):*]  The Ohio capital sentencing scheme is unconstitutional because it provides no standards for sentencing or review at several significant stages  of the process and consequently death sentences are imposed, and reviewed, without sufficient statutory guidance to juries, trial courts and

reviewing courts to prevent the unconstitutional arbitrary and capricious infliction of the death penalty.

"[*Sub-Proposition of Law 11(H):*] The decision[s] of the Supreme Court of Ohio in [*State v. Gumm* (1995), 73 Ohio St.3d 413, 653 N.E.2d 253, and *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 662 N.E.2d 311] [have] rendered the Ohio capital statutes unconstitutional in that they encourage, rather than prevent, the arbitrary and capricious imposition of the penalty of death.

"[*Sub-Proposition of Law 11(I):*] The amendments to the Ohio Constitution occasioned by the passage of Issue One, and the amendments to the Revised Code enacted by the General Assembly to facilitate the changes in the Ohio Constitution governing capital cases, violate the right of capital defendants to be free from cruel and unusual punishments, secured to them by the Eighth Amendment to the U.S. Constitution, and to due process of law and the equal protection of the laws secured to them by the Fourteenth Amendment to the U.S. Constitution. The amendment to R.C. 2953.02, purporting to enable the [Ohio] Supreme Court to weigh evidence in a capital case, violates the Ohio Constitution.

"*Proposition of Law No. 12:* It is impermissible under the Eighth and Fourteenth Amendments to the U.S. Constitution and Art. I Secs. 9 and 16 of the Ohio Constitution for the jury to be informed that a death verdict is merely a recommendation, which instruction impermissibly attenuates the jury's sense of responsibility for its decision.

"*Proposition of Law No. 13:* Where jury instructions at the penalty phase of capital proceedings misstate the law to the jury, fail to define mitigating factors, exclude relevant mitigation, and is [*sic*] otherwise erroneous and misleads [*sic*] the jury, the resulting death sentence violates the Eighth and Fourteenth Amendments, and Art. I Secs. 9 and 16 of the Ohio Constitution, and must be reversed.

"*Proposition of Law No. 14:* The increased need for reliability required in capital cases by the Ohio and federal Constitutions mandates the granting to the

defense [of] more than six peremptory challenges.

"*Proposition of Law 15:* A defendant who has been sentenced to death has been deprived of the reliable proceedings secured by the Eighth Amendment, as well as his right to due process of law under the Fourteenth Amendment, and their Ohio counterparts, where all of the proceedings are not recorded as required by law.

"*Proposition of Law No. 16:* It is a violation of the Sixth Amendment right of confrontation, as well as Ohio law, for the trial court to permit the testimony of a witness identifying the accused, when the witness did not see the defendant, but was merely told by others that the defendant was involved.

"*Proposition of Law No. 17:* A motion to suppress identification must be granted where a purported eyewitness admits that she did not see the defendant at the scene of the crime at the time of the crime.

"*Proposition of Law No. 18:* Where the state fails to prove beyond a reasonable doubt the essential elements of purpose to kill and prior calculation and design, convictions for aggravated murder must be reversed as contrary to the right of the accused to due process of law under the Ohio and federal Constitutions.

"*Proposition of Law No. 19:* Convictions for aggravated murder which are contrary to the manifest weight of the evidence must be reversed, as contrary to the right of the accused to due process of law under the Ohio and Federal Constitutions.

"*Proposition of Law No. 20:* The trial court erred to the prejudice of appellant's right to due process under the Fourteenth Amendment, and his Eighth Amendment rights as well, in entering judgment of conviction on the aggravated robbery, aggravated burglary and kidnapping counts, and the capital specifications based thereon, as those offenses were allied offenses of similar import, and while an offender may be charged with all such offenses, he may be convicted of only one.

"*Proposition of Law No. 21:* Continuous misconduct by the prosecution in the guilt phase of capital proceedings which prejudices the defendant's right to a

fair trial violates due process and requires reversal of the conviction.

"*Proposition of Law No. 22:* Where a witness' credibility has been attacked by the defense, the state may not rehabilitate that witness with a prior consistent statement made after the motive to falsify came into existence.

"*Proposition of Law No. 23:* Where the defense attacks the element of intent, but does not raise a specific defense, the state should not be allowed to interject a specific defense, and the court should not give an instruction on that specific defense.

"*Proposition of Law No. 24:* A death sentence recommended by a jury from service on which one or more veniremen were excused because of their views concerning capital punishment cannot stand unless it affirmatively appears on the record that each such venireman excused for cause unequivocally indicates that his scruples against capital punishment will automatically prevent him from recommending the death penalty and/or that such views will render him unable to return a verdict of guilty no matter what the evidence, and that he is prevented by his scruples from following the instructions of the court and considering fairly the imposition of the death sentence.

"*Proposition of Law No. 25:* Appellant's right to an impartial jury under the Sixth Amendment to the United States Constitution and Article I, Section 5 of the Ohio Constitution and to due process under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution were violated by the court[']s abuse of discretion in refusing to grant appellant's motion for individual sequestered voir dire.

"*Proposition of Law No. 26:* Where the defendant in a capital murder trial is deprived of the effective assistance of counsel at both the guilt/innocence and penalty phases of his trial, his conviction and death sentence offend the Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and their counterparts in the Ohio Constitution, and must be reversed, and a new trial granted.

"*Proposition of Law No. 27:*  A defendant's statements about the offense to a defense mitigation psychologist are subject to the Fifth Amendment privilege against self-incrimination, and it is a violation of that right, and the doctor-patient and attorney-client privilege, as well as the Sixth Amendment right to counsel, for the trial court to overrule defense objections and to require the testifying mitigation psychologist to testify as to what he was told by the defendant about the nature and circumstances of the offense.

"*Proposition of Law No. 28:*  Where, during a criminal trial, there are multiple instances of error, and the cumulative effect of such errors deprives the accused of a fair trial and undermines the reliability of the conviction and the sentence of death imposed upon a jury verdict, the rights of the accused to due process and to be free from cruel and unusual punishment, under the Fourteenth and Eighth Amendments, respectively, of the United States Constitution, and their corollaries in the Ohio Constitution, have been violated, requiring reversal."