JOURNAL ENTRY AND OPINION
Defendant-appellant Arundel Olds appeals from his conviction following a jury trial for assault on a peace officer (R.C.2903.13). Defendant contends his conviction was against the manifest weight of the evidence and he was unconstitutionally deprived of a fair trial by the court's erroneous jury instructions and prosecutorial misconduct in final argument. We find no reversible error and affirm.
This case arose from an assault upon Deputy Sheriff Randy Ussery committed by defendant in collaboration with his brother, Tavis Olds. The Olds brothers were charged with felonious assault regarding their attack on Deputy Ussery after he had approached them for having open containers of alcohol on RTA property.
Deputy Ussery testified that he was employed by the RTA police on October 15, 1998. He worked the afternoon shift from 4-10 p.m. at the rapid train station in Brook Park. While so engaged, Ussery wore his deputy sheriff's uniform and was armed with a weapon.
Around 7:00 p.m. on October 15, 1998. Deputy Ussery observed the defendant and his brother leaving the RTA station. He watched Tavis Olds walk to the side of the building to urinate. Deputy Ussery walked over to the two males and told the defendant, "Tell your friend it will be an expensive ticket if he doesn't leave right now." The defendant warned Tavis that the police were present. Tavis and defendant ran away.
About an hour later, Deputy Ussery saw Tavis Olds and the defendant walking back towards the rapid station. Defendant was wearing a waist length red and white Chicago Bulls jacket. Each of the brothers had a brown paper bag. Deputy Ussery observed each male take the brown paper bag to his face. He approached them to ask them what they were drinking.
According to the Deputy, Tavis and defendant became belligerent. They wanted to know why the deputy was bothering them over a can of beer. Deputy Ussery informed them that it was against the law to drink beer in public. The brothers continued to give the deputy a hard time about disposing of the beer. Deputy Ussery asked them to place the beer cans in the trash and leave. According to Ussery, Tavis Olds ran away at this point.
Defendant reached into his jacket, and Deputy Ussery reached for defendant's right hand, thinking that he was pulling out a weapon. A struggle ensued between the defendant and the deputy who was trying to get the defendant under control. The deputy was also trying to get rid of the beer can. Tavis Olds returned and screamed at the deputy to leave his brother alone. At this time, the deputy felt sharp blows to his kidney area. Defendant jumped on Deputy Ussery and grabbed his collar. Deputy Ussery, who was trying to protect his gun, fell to the ground on his right elbow. The center of the back of his head struck the ground. The deputy identified the defendant as the man wearing the Chicago Bulls jacket who attacked him in the manner described.
When the deputy hit the ground he was knocked unconscious. He regained consciousness and felt many blows to the back of his head. He does not know if the blows were kicks or punches. He again was knocked unconscious.
Deputy Ussery regained consciousness at Southwest General Hospital Emergency Room that same night. He was in the hospital for six days. He felt pain mostly in the center of the back of his head. He was unable to move his right arm because his elbow was fractured. His left ankle with torn ligaments was swollen. He could not move his foot. Deputy Ussery suffered from blurred vision in his right eye. Deputy Ussery still suffers from occasional pain in the left ankle.
On the night in question, there were a number of eye witnesses to the assault who came to the deputy's aid and who testified at trial. Brian Matthei was stopped at a traffic light in front of the rapid station when he saw two men move towards a police officer. One man was wearing a dark colored jacket and the other was wearing a Chicago Bulls jacket. Mr. Matthei identified the defendant as the man wearing the Chicago Bulls jacket. Matthei saw the defendant grab Deputy Ussery by the hand, pull him to the ground and dive on top of him. Matthei parked his truck and ran to the aid of Deputy Ussery who was yelling "HELP, HELP." As Matthei was running toward Deputy Ussery, he saw the defendant lying on top of the deputy and hitting him with a clenched fist. He saw Tavis Olds stomping on the deputy's head. Matthei then saw Tavis Olds drop down ad start looking for the deputy's gun.
Three other men left their cars to join Matthei in rescuing the deputy. The men and Matthei became involved in the struggle. Matthei looked right at the defendant, face to face, during the fray and identified defendant as one of the deputy's attackers. The defendant and Tavis Olds ran off once they broke free from the men.
Adam Maracz also testified that he saw two individuals involved in a struggle with a police officer. One of the individuals was wearing a black and red Chicago Bulls jacket. The other individual was wearing a yellow and black jacket. The person wearing the Bulls jacket had the deputy in a headlock and was punching him with a closed fist in the face and chest. The other individual was kicking the deputy in the stomach and the ribs.
Cheryl McArthur was in the backseat of an automobile at the traffic light on Brookpark Road when she saw two men struggling with a police officer. One was hitting the officer on the head while the other was holding the officer. She said that the one man was "banging" the officer's head on the curb. Ms. McArthur and her friend, Alice Cameron, approached Deputy Ussery to provide emergency medical treatment as both women were certified emergency medical technicians.
Jerry McArthur was in the car with his wife, Cheryl, and Alice and David Cameron. McArthur observed the incident in the parking lot at the Brookpark Road rapid station from the backseat of a car stopped at a traffic light. The car was approximately one hundred and twenty feet from where the struggle was taking place. McArthur at first thought it was a couple of kids fighting. He then saw the insignia on the deputy's shirt. McArthur stated both men were kicking and punching the deputy. McArthur was able to see the two men were assaulting the officer prior to any assistance from passers by. McArthur and his friends pulled into the parking lot and assisted the deputy who was laying on the ground. McArthur used the deputy's hand radio to call for help.
Alice Cameron, who was in the same car as the McArthurs, stated that both men were involved in the fight with the officer and that she did not see one of them standing apart from the fight. Alice Cameron could not identify the attackers. Alice's husband, David Cameron, also testified that the two men were both pushing and shoving the officer. He said that one of them was wearing a Chicago Bulls jacket.
Ohio State Trooper Gregory Grewal testified that he was on duty on October 15, 1998, from 3:00 p.m. to 11:00 p.m. Trooper Grewal was patrolling I-480 near the Brookpark Road rapid station. Trooper Grewal came upon defendant and his brother walking on the berm of 1-480. Neither defendant nor his brother told Trooper Grewal about the incident that had just occurred with Deputy Ussery. They told the trooper they were in the area to pick up a paycheck and had become lost. As a courtesy, Trooper Grewal drove defendant and his brother to a bus stop so they could catch a bus home. Only later did Trooper Grewal hear the radio broadcast of the incident, including defendant's description. Trooper Grewal immediately notified RTA police of which bus defendant was riding.
Brook Park Police Detective Timothy Robinson was on duty on the night of the incident. He responded to a radio broadcast stating that a deputy had been attacked at the RTA station. Deputy Ussery was lying face down on the ground when Det. Robinson arrived on the scene. He inspected the area around the deputy and found a wallet that contained an RTA bus pass and a county welfare card belonging to defendant. He also retrieved two beer cans from the area of the trash can next to the bus shelter. When Det. Robinson returned to the Brook Park police station he discovered that the defendant and Tavis Olds had been apprehended on the bus and placed under arrest.
When they arrived at the police station they were photographed and booked. The defendant was wearing a red, white and black Chicago Bulls jacket and blue jeans. After reading the defendant his Miranda rights, Det. Robinson interviewed defendant. The detective did not notice any physical injuries on defendant. The audiotape of the detective's interview was then played for the jury. During the interview, the defendant denied kicking or punching the deputy. Defendant told the detective, "I can't even make a fist" because his hands are crippled. Defendant said that his brother, Tavis Olds, was "tussling" with the deputy, but was not beating him.
Dr. Bhupinder Sawhny was the neurological surgeon at Southwest General Hospital who treated Deputy Ussery's head injury. Deputy Ussery was observed at the hospital for seven days. Dr. Sawhny diagnosed Deputy Ussery with "closed head injury with some neurological deficits in terms of proximal vertigo and diplopia." Dr. Sawhny opined that the injury to Deputy Ussery involved acute pain, substantial suffering and temporary substantial incapacity.
Defendant testified on his own behalf. He stated that on the evening of October 15, 1998, he and his brother were in Brook Park to collect a check from a previous employer. Defendant was wearing a Chicago Bulls jacket. On their way to the RTA station they bought beer. When they arrived at the RTA station, the deputy approached them and wanted to know what they had in the bags they were holding. The deputy said he had some problems with people drinking. Defendant testified that his brother ran away and the deputy grabbed defendant. Defendant said that his brother returned and tackled the deputy and the impact knocked defendant's wallet and change from his jeans. Defendant began to pick up his change and did not lay a finger on the deputy. On cross-examination, the defendant demonstrated to the prosecutor how his brother was punched with a closed fist by the men who came to the deputy's aid. He then admitted that in his statement to the police he had stated that he was not able to make a fist. He explained the inconsistency by stating he was in a state of shock when the officers were questioning him. He then admitted he could make a fist, but that he could not punch with it. Later, on re-cross, he admitted that he could punch with a closed fist.
Tavis Olds also testified that he made a statement to the police on the night of the incident. He was originally charged with both felonious assault and aggravated robbery of Deputy Ussery's gun, but Tavis pled guilty to an agreed plea of only felonious assault on a peace officer. Tavis testified that the deputy grabbed the defendant and began to swing him around so Tavis returned to help his brother. Tavis said that the deputy fell to the ground when he tried to free defendant from the deputy's grasp. Tavis never saw defendant kick or punch Deputy Ussery, and denied that he himself punched or kicked the deputy. He claimed he grabbed the deputy's legs as he was falling down and this caused the deputy to fall. Some men arrived in a car to help the deputy at which time defendant and Tavis ran away from the scene.
Following the jury verdict on the lesser charge of assault on a peace officer, the trial court sentenced the defendant to eighteen months incarceration and imposed a fine of $2,000. Defendant thereafter filed this timely appeal.
We will address defendant's assignments of error in the order presented.
I. THE VERDICTS ARE AGAINST THE WEIGHT OF THE EVIDENCE.
Defendant contends that the unanimous verdict must be vacated because no reasonable jury could have found that the defendant was the one that assaulted the deputy. Defendant argues that his brother testified to his sole culpability for the assault and that the State's witnesses were not credible.
The standard of review we must observe in passing on the manifest weight of the evidence issue was set forth by the Supreme Court of Ohio as follows in State v. Thompkins (1997), 78 Ohio St.3d 380,386-87:
 Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. Robinson, supra, 162 Ohio St. at 487, 55 O.O. at 388-389, 124 N.E.2d at 149. Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis added.) Black's supra, at 1594.
 When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "`thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony. Tibbs, 457 U.S. at 42, 102 S.Ct. at 2218, 72 L.Ed.2d at 661. See, also, State v. Martin (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720-721
("The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction")
We find upon review of the record as a whole the evidence was sufficient to permit the jury to properly find that the State proved beyond a reasonable doubt that the defendant assaulted Deputy Ussery.
The victim specifically identified the defendant as the one who jumped on him, grabbing him by the collar and punching him as the victim was taken to the ground with defendant on top of him.
Defendant and his brother testified that defendant never hit, punched or kicked the deputy. However, their testimony that defendant was never involved in the struggle directly contradicts the testimony of the victim and every disinterested eyewitness who testified. Brian Matthei, coming to the aid of the deputy, saw defendant in his Chicago Bulls jacket laying on top of the deputy and hitting him with a closed fist. Matthei positively identified defendant as one of the two assailants because he came face to face with defendant while attempting to rescue the deputy.
Adam Maracz, another eyewitness, saw two individuals struggling with the deputy. Mr. Maracz said that the two assailants were working together; that the one wearing the Bulls jacket was holding the deputy down and punching him, while the other kicked the deputy's body. It was not disputed that defendant was wearing the Chicago Bulls jacket.
Both Cheryl and Jerry McArthur testified that they saw two men assaulting the officer by kicking and punching.
Alice Cameron, who was in the same car as the McArthurs, also testified that both men were beating the deputy and she did not see one of the men standing apart from the fighting. Alice Cameron's husband stated that one of the attackers was wearing a Chicago Bulls jacket.
The jury had the opportunity to weigh the reliability of each piece of evidence and testimony firsthand. The credibility of witnesses is for the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. Viewing the evidence in its totality indicates that the jury did not lose its way or create a manifest miscarriage of justice that would require a new trial. The conviction was not against the manifest weight of the evidence.
Assignment of Error I is overruled.
 II. THE TRIAL COURT [SIC] ERRONEOUS INSTRUCTION ON CAUSATION DEPRIVED THE APPELLANT A FAIR TRIAL AS REQUIRED BY THE FIFTH
AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.
During the jury instruction phase of the trial the court instructed the jury as follows concerning causation:
 Cause: The State charges that the act of the defendant caused serious physical harm to Randy Ussery. Cause is an essential element of the offense. Cause is an act which in the natural and continuous sequence directly produces a serious physical harm and without which it would not have occurred.
 Natural consequences: The defendant's responsibility is not limited to the immediate or most obvious result of the defendant's act. The defendant is also responsible for the natural and foreseeable consequences or results that follow in the ordinary course of events from the act.
(Tr. at 609). The trial court thereafter instructed the jury regarding the lesser included offense of assault and advised them that cause is as previously defined for felonious assault but that assault did not require "serious physical harm." (Tr. at 613).
Defendant contends that this instruction is improper for assault cases because it changes the mens rea from "knowingly" to "recklessly." We disagree.
In the case at hand, the instruction read by the court properly expresses the standard jury instructions for the charge of assault as suggested by Ohio Jury Instructions. 4 OJI 503.13, ASSAULT, provides suggested jury instructions for each of the essential elements of the crime of assault, including CAUSATION, 4 OJI 409.55, which is the instruction given verbatim by the trial court in the case at hand. This OJI instruction comports with the requirements of the assault statute, R.C. 2903.13, and the statutes regarding mental culpability, R.C. 2901.21 and R.C. 2901.22, which provide the definitions of purposely, knowingly and recklessly.
The assault statute with which defendant was charged provides in pertinent part that "no person shall knowingly cause or attempt to cause physical harm to another * * *," and the definition of "knowingly" in R.C. 2901.22(B) provides in pertinent part that "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature * * *." We find the trial court properly instructed the jury as to causation with regard to the offense of felonious assault.
In any event, the defendant failed to make any objection to these instructions and therefore, absent plain error, he has waived any objection to the instructions on appeal. State v.Spirko (1991), 59 Ohio St.3d 1, 34. We find no plain error.
Assignment of Error II is overruled.
 III. THE STATE IMPERMISSIBLY COMMENTED [ON] DEFENSE "TACTICS" DURING CLOSING ARGUMENT, THEREBY DEPRIVING THE APPELLANT A FAIR TRIAL AS REQUIRED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.
Defendant argues that the prosecutor made improper comments during closing argument by attacking defense counsel's strategy and that such comments prevented a fair trial overall for defendant.
The test for prosecutorial misconduct is whether the conduct complained of deprived the defendant of a fair trial. State v.Fears (1999), 86 Ohio St.3d 329, 332, citing State v.Apanovitch(1987), 33 Ohio St.3d 19. The prosecution is, as is the defense, entitled to a certain degree of latitude in its concluding remarks. State v. Smith (1984), 14 Ohio St.3d 13. Improper closing remarks require reversal, when the argument viewed in its entirety denies defendant a fair trial. State v. Woods (1982),8 Ohio App.3d 56, 62. However, "[a] claim of error in a criminal case cannot be predicated upon the improper remarks of counsel during his argument at trial, which were not objected to, unless such remarks serve to deny the defendant a fair trial." State v.Wade (1978), 53 Ohio St.2d 182, paragraph one of syllabus.
In the present case, defendant alleges that the closing arguments of the prosecutor improperly commented on defense tactics. A review of the record indicates that defendant's trial attorney did not raise an objection to the prosecutor's comments during closing arguments or at sidebar. Furthermore, defendant's trial attorney did respond to the prosecutor's argument of an "eleventh hour" motive to Tavis' testimony by pointing out that Tavis had always wanted to take responsibility for the attack on the deputy.
The comments by the prosecutor did not jeopardize defendant's right to a fair trial. The reference to an eleventh hour change of strategy merely referred to the fact that defendant's brother, recently convicted of the same crime, was trying to divert attention and ultimate blame from the defendant. This was fair comment given the dynamics of the trial and the dual responsibility of the brothers. This presents no basis for a claim that defendant did not receive a fair trial.
Assignment of Error III is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
O'DONNELL, P.J., and JAMES D. SWEENEY, J., CONCUR.
 _______________________ JAMES M. PORTER, JUDGE