A jury found the defendant Anthony Andrejic guilty of two counts of conspiracy to commit murder, four counts of attempted aggravated murder and one count of retaliation. In this appeal, he contends that the court erred by admitting other acts evidence and that the state failed to present sufficient evidence on all of the counts to permit them to go to the jury for consideration.
In order to give a complete statement of the facts, we must delve into two separate, but related crimes committed by the defendant. In July 2000, the police obtained information about drug activity occurring at a house owned by the defendant and his wife. At the time, the defendant was a medical doctor, working as a resident in an area hospital. The police went to the defendant's place of employment and interviewed him. They learned that the defendant had a serious drug addiction. He had recently been in an automobile accident while under the influence of drugs, and had also nodded off while performing surgery on a patient. His employer discovered his drug use and demanded that he seek drug treatment or face termination. During an interview with the police, the defendant admitted his drug use and said that his wife had been using crack cocaine. The defendant went on to say that in exchange for sexual favors, he would sometimes write prescriptions for narcotics. He said that his wife had been involved with a man named "Mike" who supplied his wife with cocaine. This last piece of information prompted the police to sign the defendant up for their confidential informant program.
The defendant continued to go to drug treatment even as the police were hoping to use him as an informant. While in drug treatment, the defendant met Todd Roland. Roland soon convinced the defendant that he could make money selling prescriptions for narcotics. The defendant agreed and sold Roland a prescription for the drug OxyContin.
When Roland left drug treatment, he went to the police and told them that the defendant was selling prescriptions. The police decided to use Roland as a confidential informant against the defendant. They had Roland arrange to pay the defendant $2,500 for four prescriptions. The drug buy went forward at the defendant's office and he wrote three prescriptions for OxyContin, Percocet and Vicodin ES. The defendant consented to a search of his office and the police found a briefcase containing the cash used in the drug deal.
In questioning following the defendant's arrest, the police confronted the defendant with allegations that he had been planning to kill his wife. During his time in drug treatment with the defendant, Roland learned that the defendant had expressed a desire to kill his wife. The defendant told the police that his wife was involved with a man named "Mike" (Mike Smith, one of the victims) who had been selling her drugs and forcing her to prostitute herself for him. The defendant hoped to inject his wife with either heroin or potassium chloride, a drug that would make it appear as if his wife had a heart attack. Because the defendant would be in drug treatment at the time, he believed he would have a solid alibi. He tried to tell the police that he did not really want his wife killed, but also said that when discussing his wife's murder with Roland, he "was hot enough."
When searching the defendant's house after his arrest, the police found a home-made video tape of the defendant and his wife that showed the defendant telling his wife that he would kill her.
The defendant was charged with drug trafficking, pleaded guilty to the charges and received four and one-half years imprisonment. He was transferred to the county jail to await transportation to prison.
While waiting in jail, the defendant became friendly with a fellow inmate named Charles Corwin. In discussions with Corwin, the defendant said that he wanted to kill Mike Smith and Todd Roland for their roles in his drug use and conviction for drug trafficking. Corwin told the defendant that he knew some people that could do the job, and the defendant told Corwin that he would give him an automobile if Corwin could arrange the deaths. When asked about the possibility that his wife might be killed in an attempt on Smith's life, the defendant said that she would be considered "collateral damage." The defendant's wife was pregnant at the time, and he suspected that Smith was the father.
Corwin then went to the police and told them about his discussions with the defendant. The police put a wire on Corwin and he engaged the defendant in an extended discussion of, among other things, the murder plot. To extend the ruse, a police officer acted as the assassin. Using Corwin's mother to arrange a three-way call, the defendant spoke to the police officer/purported assassin from the county jail.
In further discussions, the defendant told Corwin that he wanted Roland dead for the part he played in the sting operation that led to the arrest for trafficking. Smith's involvement with the defendant's wife, both as a suspected drug dealer and paramour, explained the defendant's desire to have him killed. The defendant agreed to pay $30,000 for the job. As a show of good faith, he signed over his power of attorney to Corwin's mother so that she could withdraw $150 that he had in a bank account for a down payment. All of these conversations provided the basis for the indictments in this case.
The defendant testified on his own behalf and denied wanting to kill anyone. He admitted that he had conversations with Corwin, but said that he hoped to get the goods on Corwin — that way he could go to the police and possibly receive a sentence reduction. He explained that he gave Corwin's mother the power of attorney so that she could transfer money into his commissary account at the county jail.
The defendant's wife also testified for the defense and said that she did not believe that the defendant intended to kill her as shown on the video tape. While she admitted that at one time she did believe that the defendant might kill her, she later came to the conclusion that he would not hurt her. She said that both she and the defendant were heavy drug users at the time, and all their actions were influenced by drugs. The wife did not deny that she and the defendant had marital problems at the time, and further admitted that both of them had extra-marital relationships.
 I
The defendant's first assignment of error is that the court erred by admitting into evidence portions of the video tape found in the defendant's house that showed him threatening to kill her. The defendant argues the video tape shown to the jury referenced sex acts he performed on his wife that were inadmissible as other acts evidence that severely prejudiced him. The court admitted parts of the video tape and questions about some of the acts contained on the video tape over the defendant's vigorous objection.
Evid.R. 404(B) prohibits the admission of other acts evidence to prove the character of a person in order to show that the person acted in conformity with the evidence. However, the rule permits the admission of other acts evidence as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake." State v.Lowe (1994), 69 Ohio St.3d 527, 530. Evidence should not be admitted as an exception to Evid.R. 404(B) unless the matter concerned is genuinely a material issue. State v. Smith (1992), 84 Ohio App.3d 647.
As with any other type of evidence, admission of other acts testimony must not only meet the prerequisites of Evid.R. 404(B), but it must also pass muster under Evid.R. 403(A) which requires the exclusion of relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice * * *." The admission or exclusion of evidence lies in the trial court's sound discretion, State v. Sage (1987),31 Ohio St.3d 173, and this applies to admission of other acts evidence as well. State v. Bey (1999), 85 Ohio St.3d 487, 489-490.
The video tape found in the search of the defendant's house shows him engaging in sexual conduct with his wife while she is in a drug-induced stupor. The tape is of poor quality, and the detective said that engineers at the National Aeronautics and Space Administration enhanced it. The vocal track is difficult to hear.
The tape was highly inflammatory and all the parties knew this — it was the subject of a great deal of discussion among the court and the parties. This was for good reason, as the sexual acts depicted on the tape were truly pornographic in nature, and the wife's consent to much of what occurred on the tape was questionable given her lack of coherency and/or consciousness throughout most of it.
Despite the inflammatory nature of the tape, the tape was mentioned by defense counsel in a question put to the defendant during his direct testimony. The defendant claimed that he had no recollection of the video tape and, in fact, had never viewed the video tape. When asked whether he and his wife were shown arguing on the video tape, the defendant said, "I don't recall we were in an argument. We were just talking. We weren't getting loud or anything like that, as far as I recall." The defendant went on to say that he had "no recollection of what I said at the end of that, and I have not seen that video since I taped it * * *." He denied making a real threat to kill his wife, claiming he was letting the wife know that he was "pissed off." The defendant went on to profess his love for the wife, claiming that they were going to renew their marriage vows and that she had been seeing him regularly in jail, despite his counsel's advice that he should not talk to her.
On cross-examination, the state asked the defendant to recall his testimony about not being able to recall what was on the tape, yet being able to deny that he and his wife were shown arguing on the tape. The defendant recalled that "I said I didn't remember me having any argument with my wife." The court played a portion of the video tape showing a conversation occurring after the wife became coherent. We do not know exactly what the jury saw, as the transcript merely indicates in a number of places that "a portion of the video tape was played to the Court and jury." Answers to some questions about the video tape suggest to us that the jury saw the end of the video tape in which the nude defendant is shown lying on top of the wife and saying in a low voice, "If I find out, I'll kill you. If I find out, I'll kill you." As the tape continues, the defendant says, "If he finds out, I'll kill you." The defendant said this was a reference to his wife's father, although he could not recall why he made this reference. As the tape continues, the wife regains her coherency and becomes clearly distraught that the defendant shaved her pubic region and had anal sex with her while she was incoherent. The tape closes with her saying that she has been raped.
In questioning of a police detective called as a rebuttal witness, the state inquired about the video tape and allegations the wife made to the police after learning about the defendant's plot to kill her. The detective said that the wife watched the video tape in his presence and, after seeing what transpired while she had been incoherent, commented that she had been raped by the defendant. She insisted that the defendant be prosecuted for rape and swore out a complaint against him. The detective said that the state did not charge the defendant with rape.
The defendant maintains any references to the sexual acts depicted on the video tape are wholly irrelevant to the charged counts of conspiracy to commit aggravated murder. He maintains he made the video tape long before any allegations arose that he intended to kill the wife, and that there could have been no connection to the charged offenses of conspiracy to commit aggravated murder.
We agree with the defendant that the state could not use the video tape as other acts evidence under Evid.R. 404(B). The events depicted on the tape were too remote in time to be relevant to the charge of conspiracy to commit murder.
There was likewise no showing of motive contained in the video tape. Assuming that the video tape accurately depicted the defendant's desire to kill the wife, that desire had waned by the time he conspired to hire someone to kill the informant and pusher. This conclusion follows from the defendant's own recorded conversations in which he did not specify the wife as a target for hired killers. It is true that he acknowledged that in the event Smith were killed and the wife happened to be with him at the time, she might die as well — "collateral damage" — as the defendant put it. But she was not a primary target at the time he conspired with Corwin. Hence, there is no connection between the statements contained on the video tape and the conspiracy to commit murder. The video tape could not have been used as other acts evidence under Evid.R. 404(B).
The state argues that it did not use the tape as character evidence, but rather to impeach the defendant's credibility after he claimed that he and his wife had not been arguing on the video tape and that they had a good marriage. The defendant testified:
 I love my wife. I've always loved my wife. We were going to renew our vows this year. I mentioned in the taped testimony here that, you know, she's the mother of my child, and I love her. I hoped she would get herself, you know, clean again in rehab, and fix herself up. It's no way to live, what was happening to her.
In response to a question about the current state of their relationship and whether he and his wife had made plans for the future, the defendant said:
 Yes, we carry on as husband and wife. I mean, nothing really changes, other than she's become sober, and she's come to see me. She seems to have gotten her life together, found I was still here at County Jail, and she came down to see me.
Evid.R. 607(A) permits the impeachment of any witness, subject to certain exceptions not applicable here, but the state's argument that it used the video tape to impeach the defendant about the state of his marriage is dubious at best. Perhaps the defendant did put the soundness of his relationship with his wife into play, but he did so by talking about his current relationship, as of the date of his testimony, not in the past. This was clear as he talked about his wife visiting him in jail and the plans they were making for the future.
At the time he made the video tape, the defendant did not have a good relationship with his wife. The defendant made no effort to hide that fact — the evidence showed that both the defendant and his wife had destructive relationships outside the marriage, and that their drug addictions led them to conduct their lives in a manner far different than they would have while sober. No portion of the cited testimony (as offered by the state) suggests that the defendant meant to say that he and his wife had a "marriage that was filled with love, kindness and hope." See Appellee's Brief at 11. The defendant did not claim that at the time of his first drug offense and the time of making the video tape, that he and the wife had a perfect relationship. Far from it, they had significant problems. So there would have been no basis for finding that the defendant put his credibility at issue on this point.
The video tape is highly inflammatory, and the court knew this. It thought that playing only portions of the video tape would cure any claim of prejudice, but it clearly did not accomplish this goal. Although the jury did not see any of the sexual conduct shown on the video tape, the wife's comments following her return to coherency can leave no doubt as to what just transpired. The wife is shown discovering that the defendant had performed anal sex on her and shaved her pubic area. She claims that he raped her. It bears mentioning that the defendant is nude and his wife, although clothed, is in a state of disarray following the sex acts.
The court wrongly thought that it could minimize the prejudice to the defendant by showing only portions of the video tape. Our review of the video tape convinces us that no reasonable juror could have been able to differentiate the issue of credibility as now argued by the state from the allegations of sexual abuse made by the wife. The video tape should not have been played to the jury. It is the function of the state to vigorously prosecute its case, but at the same time to protect the rights of the accused and ensure a fair trial. The use of the video tape is more perplexing because the state did not need it to prove the allegations contained in the indictments.
The remaining question concerns the prejudice from the video tape. No error is reversible unless it can be shown that the error contributed to the verdict. State v. Fears (1999), 86 Ohio St.3d 329, 339. Although we are troubled by the playing of the video tape, we cannot say that this error contributed to the guilty verdict. The evidence of the defendant's conspiracy to commit murder was overwhelming, and will be discussed in greater detail in assignments of error that follow. The short answer is that the state presented tape recorded conversations documenting the conspiracy and evidence that the defendant had taken affirmative steps to secure money for a down payment on the killings. On this record, we cannot find that the error was so prejudicial that it mandates reversal. The first assignment of error is overruled.
 II
The second and third assignments of error collectively raise issues concerning the sufficiency of the evidence and argue that the court erred by denying the defendant's motion for judgment of acquittal on the counts of attempted aggravated murder and retaliation.
 A
The court shall not grant a Crim.R. 29(A) motion for judgment of acquittal if the evidence is such that after construing the evidence in a light most favorable to the state, reasonable minds could reach different conclusions as to whether each element of a charged offense has been proven beyond a reasonable doubt. State v. Bridgeman (1978),55 Ohio St.2d 261, syllabus. This is, in essence, a claim that there was insufficient evidence to establish the elements of the offense. We must look at the evidence in the light most favorable to the prosecution and decide whether any reasonable trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Statev. Jenks (1991), 61 Ohio St.3d 259, 273.
 B
R.C. 2923.01 defines the crime of conspiracy as follows:
 (A) No person, with purpose to commit or to promote or facilitate the commission of aggravated murder or murder, * * * shall do either of the following:
 (1) With another person or persons, plan or aid in planning the commission of any such offense;
 (2) Agree with another person or persons that one or more of them will engage in conduct which facilitates the commission of any such offense.
 (B) No person shall be convicted of conspiracy unless a substantial overt act in furtherance of the conspiracy is alleged and proved to have been done by him or a person with whom he conspired, subsequent to the accused's entrance into the conspiracy. For purposes of this section, an overt act is substantial when it is of such character as to manifest a purpose on the part of the actor that the object of the conspiracy should be completed. * * *
"* * * [T]he phrase `overt act' means an open act, done outwardly, without attempt at concealment, and performed pursuant to and manifesting a specific intent or design." State v. Papp (1980), 68 Ohio App.2d 21, paragraph one of the syllabus.
The state presented compelling evidence of the defendant's conspiracy to commit murder. Corwin's testimony and tape recordings of his conversations with the defendant could leave no doubt that the defendant intended to kill his wife, Smith and Roland. The defendant is heard making elaborate plans for the murders, including the method of murder and how he would pay for it. The defendant had an obvious motive to kill both Smith and Roland, as they were intimately involved with his prior conviction for drug trafficking. The wife was included in this conspiracy by virtue of her relationship with Smith. Although the wife was not specifically targeted as were Smith and Roland, the defendant clearly understood that his wife might be with Smith at the time and he considered her possible death as "collateral damage." Given the past history of drug trafficking and his annoyance with his wife for becoming involved with a man he believed to be supplying drugs to her, the basis for the conspiracy takes complete form.
The evidence of a substantial step was also compelling. The defendant spoke with an undercover police detective whom he thought was the hitman and made arrangements for the murders. The defendant also gave Corwin's mother his power of attorney so that she could withdraw funds as a partial down payment on the job. He agreed on a price and made payment arrangements, noting that he would be making a great deal of money once released from prison. All of these acts were substantial steps toward the completion of the conspiracy. See State v. Ayers (Mar. 16, 2001), Erie App. No. E-99-06, unreported.
The defendant makes light of the state's characterization of the withdrawal of $150 as a down payment for a hitman, saying it would be "ridiculous" to believe that this small amount could have been intended to pay for three murders. It may have been ridiculous to think that $150 could make a down payment on three murders, but so many other aspects of the defendant's criminal past showed his naivete in matters of crime that it becomes more and more plausible to think that he actually believed that this small amount would be enough. In any event, the defendant had discussed paying as much as $30,000 for the murders and went on to make arrangements to pay Corwin for his services in procuring a killer. Reasonable minds could have viewed the defendant's attempt to get cash as a down payment as being a substantial step in furthering the conspiracy.
The state also presented sufficient evidence to show that the defendant knew his wife was pregnant at the time he conspired to murder her. The wife admitted that she was pregnant, albeit not by Mike Smith, at the time the conspiracy began to take form. Regardless who was the father of the child, the fact remains that the defendant did know that she was pregnant and knew that her death would certainly cause the wife's pregnancy to terminate as well.
Because a reasonable trier of fact could have found the essential elements of the conspiracy proven beyond a reasonable doubt, the court did not err by denying the defendant's motion for judgment of acquittal on all conspiracy counts.
 B
The count of retaliation related to Roland as a result of his participation in the defendant's drug trafficking conviction.
A charge of retaliation requires the state to prove that the accused, purposely and by force or by unlawful threat of harm, retaliated against a witness who was involved in a civil or criminal act. See R.C. 2921.05(A). When a threat against a witness forms the basis of a charge under R.C.2921.05(A), that threat can be communicated either directly to the victim or communicated to a third person so that the third person could be reasonably expected to convey the threat to the victim. State v. Lambert
(June 5, 1998), Montgomery App. No. 16667, unreported.
Roland did not testify at trial, and there is no evidence that the defendant made an actual threat to him; therefore, the conviction for retaliating against Roland must be premised on the theory that the police communicated the threat to Roland. The police detective testified that Roland was advised of the initial threat presented in light of Corwin's taped conversations. This was sufficient evidence to show that the threat had been communicated to Roland. The court did not err by denying a motion for judgment of acquittal on this count.
 III
The fourth assignment of error complains that the convictions for attempted aggravated murder and retaliation were against the manifest weight of the evidence. The defendant maintains that a focused jury would not have considered his threats to be a serious attempt to forge a conspiracy.
A claim that a jury verdict is against the manifest weight of the evidence is nothing more than a claim that the jury lost its way — that no reasonable person could have reached the same decision. State v.Thompkins (1997), 78 Ohio St.3d 380. This is an extremely difficult standard to meet because we recognize that the jury is in a better position to view the evidence and weigh the credibility of the witnesses.State v. DeHass (1967), 10 Ohio St.2d 230. If the jury's verdict is supported by sufficient competent and credible evidence going to each essential element of the crime charged, this court may not reverse. Id.
The defense's theory in this case was that the defendant had been trying to do the same as Corwin — document potential wrongdoing and go to the authorities with the hope that his assistance would yield a reduction in sentence. The defendant claimed that his conspiracy was so half-baked that no reasonable person would have thought he was serious in carrying out the conspiracy. As proof of this, he claimed that he immediately knew that Corwin's alleged assassin was actually the police detective whom he had spoken with when arrested for drug trafficking. The taped recordings indicate that he suspected the alleged assassin was the detective, and he claims that it would make no sense for him to make this observation yet to continue to press on with his plan.
We cannot accept the defendant's explanation that his jailhouse conspiracy was a canard when the state was able to prove by the defendant's own admission that he signed a statement in which he discussed his plans to kill his wife by giving her a lethal injection that would look like a drug overdose. And his animosity against Smith, the alleged drug dealer, was admitted by him and perhaps even understandable. A motive against Roland was obvious. So the defendant had all kinds of motive to commit murder and he took the time to think out and discuss possible means of killing his victims. It will not do to say that the conspiracy was so poorly thought out that the defendant could not have seriously meant to carry out. "The state has no duty to distinguish between intelligent criminal plans and imprudent criminal plans as part of proving intent to commit a criminal act." State v. Wills
(1997), 120 Ohio App.3d 320, 331. The jury could certainly reject the defendant's explanations and find he acted with knowing purpose to murder.
Nothing in the evidence convinces us that the jury lost its way in finding the defendant guilty of the attempted aggravated murder and retaliation charges. The verdicts were not against the manifest weight of the evidence.
 IV
For his final argument, the defendant argues that the court erred by giving him the maximum sentence because he had "almost no criminal history and no harm came to anyone involved in the case. He maintains that he poses no harm to anyone and that his past actions were merely irrational, harmless talk. See Appellant's Brief at 22.
The overriding purposes of the felony sentencing statutes are to protect the public from future crime by the offender and to punish the offender. See R.C. 2929.11(A). A sentence imposed for a felony should be calculated to achieve these two purposes, and be commensurate with the offender's conduct without demeaning the seriousness of that conduct or the impact that conduct had on the victims. See R.C. 2929.11(B). Moreover, the sentence should be consistent with sentences imposed for similar crimes committed by similar offenders. Id. The court has broad discretion when considering these sentencing factors. State v. Yontz (1986), 33 Ohio App.3d 342, and we cannot modify or vacate a sentence on appeal unless we find by clear and convincing evidence that the sentence is not supported by the record or is contrary to law. See R.C.2953.08(G)(1).
If the court wishes to impose the maximum sentence on an offender, it must first make a finding that the offender committed the worst form of the offense or that offender poses the greatest likelihood of committing future crimes. See R.C. 2929.14(C). Second, the sentencing court must state reasons that support its findings. See R.C. 2929.14(B)(2)(d); Statev. Parker (2001), 144 Ohio App.3d 344, 336.
The court fully complied with the applicable sentencing statutes, so we find no error with the court's decision to impose the maximum sentence. The defendant was not a first-time offender, as he had a prior conviction for drug trafficking. So he was not entitled to a presumption for the shortest term possible.
The court went on to find that the defendant committed the worst form of the offense and that he posed a great risk of committing future crime. The court noted that the defendant planned a murder by car bomb, and in the process joked that the victims would likely need a parachute as the force of the explosion would throw them a great distance from the blast. The court also cited to the heartless nature of the planned murders and the defendant's relentlessness in pursuing his goal — making plans while incarcerated for another offense — as indicating a great likelihood that he would reoffend in the future. These reasons supported the statutory factors.
We need not focus any further on the statutory factors, as the defendant does not contest any of the court's reasons. Instead, he suggests that his conduct was the result of drug use, and that in any event, none of the victims suffered any harm because the police broke up the conspiracy before it reached fruition.
It may be that the defendant's drug use prompted the events that caused his life to spiral out of control, but we see no connection between his drug use and the jailhouse conspiracy to commit murder. Presumably, the defendant was not under the influence of drugs while being held in jail and conspiring to kill. He at least represented as much during his guilty plea for drug trafficking. So his past drug use cannot explain away his desire to commit murder while being held in the county jail. That conspiracy stemmed from a sober mind.
We likewise reject an argument that suggests that an attempt to commit a crime that does not cause injury to the victim cannot be considered the worst form of the offense. By its very nature, an attempt to commit an offense means that the offender did not accomplish the intended goal. But that does not mean that no harm was done to the victim. We have found that attempts to commit rape, for example, can constitute the worst form of the offense. See State v. Corrigan (May 25, 2000), Cuyahoga App. No. 76124, unreported. In this case, the court considered that the harm to victims was palpable, and Roland submitted a statement to the court on how the murder conspiracy affected him and his family. And while the defendant's wife testified for the defense, it was clear at the time the police first learned of the conspiracy that she believed her life was in danger. We can understand that a victim of a conspiracy for murder by hire would live in constant fear and suspicion. Under these circumstances, the court did not abuse its discretion by finding this to be the worst form of the offense.
The assigned errors are overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
TIMOTHY E. McMONAGLE, A.J., and COLLEEN CONWAY COONEY, J., CONCUR.